Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JAMES SETTLE, an                )
individual,                     )
                                )
                                )
            Plaintiff(s),       )
                                )
vs.                             ) No. C 7-05813 JSW
                                )
WACKENHUT CORP. BONNIE          )
SUTTERFIELD, DALE SCHMIDT,      )
JANICE WOELFFER, DOES 1         )
through 10,                     )
                                )
                                )
            Defendant(s).       )
_____)


- - - -

DEPOSITION OF JAMES SETTLE

Held at Gordon & Rees

275 Battery Street, 18th Floor

San Francisco, California

Thursday, June 26, 2008

10:44 a.m. - 4:34 p.m.

- - - -


REPORTED BY:  James Beasley, CSR No. 12807

JOB NO.:  263919

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 8

| | | |
|---|---|---|
| 10:47 | 1 | guessing, because you've never been to my office in |
| 10:47 | 2 | Los Angeles office. |
| 10:47 | 3 | Do you understand? |
| 10:47 | 4 | A.   Yes. |
| 10:47 | 5 | Q.   If at any time you don't understand the |
| 10:47 | 6 | question or you didn't hear it, please feel free to |
| 10:48 | 7 | ask me to repeat it or rephrase it; otherwise |
| 10:48 | 8 | myself and anyone reading the transcript in the |
| 10:48 | 9 | future will be assuming that you understood the |
| 10:48 | 10 | question.  Okay? |
| 10:48 | 11 | A.   Okay. |
| 10:48 | 12 | Q.   All right.  Can you please state and spell |
| 10:48 | 13 | your name for the record. |
| 10:48 | 14 | A.   My name is James, J-a-m-e-s.  Settle, |
| 10:48 | 15 | S-e-t-t-l-e. |
| 10:48 | 16 | Q.   No middle name? |
| 10:48 | 17 | A.   It's L, Lendell. |
| 10:48 | 18 | Q.   Could you spell your middle name for us. |
| 10:48 | 19 | A.   It's L-e-n-d-e-l-l. |
| 10:48 | 20 | Q.   How old are you, Mr. Settle? |
| 10:48 | 21 | A.   I'm 45. |
| 10:49 | 22 | Q.   What is your current residence? |
| 10:49 | 23 | A.   I live at 4721 Nicol Commons. |
| 10:49 | 24 | Q.   Could you spell the street name. |
| 10:49 | 25 | A.   It's N-i -- N-i-c-o-l, C-o-m-m-o-n-s. |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 22

| | | |
|---|---|---|
| 11:16 | 1 | BY MR. WAGNER: |
| 11:16 | 2 | Q.   Now, when did you first start working for |
| 11:16 | 3 | The Wackenhut Corporation? |
| 11:16 | 4 | A.   April 9th, 2003. |
| 11:16 | 5 | Q.   Prior to working for The Wackenhut |
| 11:16 | 6 | Corporation, had you ever filed an administrative |
| 11:16 | 7 | charge with the EEOC or DFEH against a previous |
| 11:16 | 8 | employer? |
| 11:16 | 9 | A.   No. |
| 11:16 | 10 | Q.   Have you ever filed a Workers' |
| 11:16 | 11 | Compensation claim against a previous employer? |
| 11:16 | 12 | A.   Yes.  Workers' Comp, yes, years ago. |
| 11:16 | 13 | Q.   More than 10 years ago? |
| 11:16 | 14 | A.   Yes. |
| 11:16 | 15 | Q.   Against which employer? |
| 11:16 | 16 | A.   Federal Express. |
| 11:16 | 17 | Q.   And what was the nature of the injury? |
| 11:17 | 18 | A.   I hurt my back. |
| 11:17 | 19 | Q.   Do you know approximately what year that |
| 11:17 | 20 | was? |
| 11:17 | 21 | A.   No. |
| 11:17 | 22 | Q.   Okay.  But more than 10 years ago? |
| 11:17 | 23 | A.   Yes. |
| 11:17 | 24 | Q.   Okay.  Was that here in California? |
| 11:17 | 25 | A.   No. |

03

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

| | | |
|---|---|---|
| 11:28 | 1 | A.   I'm trying to think who Rabco is, remember |
| 11:28 | 2 | who they were. |
| 11:28 | 3 | Q.   Do you remember what kind of work you did |
| 11:28 | 4 | for Rabco? |
| 11:28 | 5 | A.   I can't remember who they were. |
| 11:28 | 6 | Q.   Other than Acufacts Security, have you |
| 11:29 | 7 | ever been fired from any other employer? |
| 11:29 | 8 | A.   I don't remember. |
| 11:29 | 9 | Q.   But it's possible? |
| 11:29 | 10 | A.   It's possible. |
| 11:29 | 11 | Q.   All right.  Who hired you at The Wackenhut |
| 11:30 | 12 | Corporation? |
| 11:30 | 13 | A.   Jim Lipman. |
| 11:30 | 14 | Q.   I'm sorry.  Could you spell the last name. |
| 11:30 | 15 | A.   Lipman.  I think it's L-i-p-m-a-n. |
| 11:30 | 16 | Q.   Jim Lipman? |
| 11:30 | 17 | A.   Yeah. |
| 11:30 | 18 | Q.   What was Mr. Lipman's title? |
| 11:30 | 19 | A.   He was the office manager at the time. |
| 11:30 | 20 | Q.   At what branch? |
| 11:30 | 21 | A.   San Ramon. |
| 11:31 | 22 | Q.   What was your first assignment for The |
| 11:31 | 23 | Wackenhut Corporation, what most? |
| 11:31 | 24 | A.   First post was at Chevron. |
| 11:31 | 25 | Q.   And where is the Chevron facility located? |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 32

| 11:31 | 1 | A. It was -- I started at Chevron, Bishop |
| 11:31 | 2 | Ranch. |
| 11:31 | 3 | Q. And is that the name of the city, Bishop |
| 11:31 | 4 | Ranch, or the name of the facility? |
| 11:31 | 5 | A. The facility. It was in San Ramon, Bishop |
| 11:31 | 6 | Ranch. |
| 11:31 | 7 | Q. And what shift were you working when you |
| 11:31 | 8 | started at the Chevron Bishop Ranch? |
| 11:31 | 9 | A. I think it was a swing shift or was it a |
| 11:31 | 10 | morning shift? It might have been a morning shift. |
| 11:32 | 11 | All I know is it was a temporary post. I was |
| 11:32 | 12 | guarding a door when I first started. |
| 11:32 | 13 | Q. How long did you stay at Bishop Ranch? |
| 11:32 | 14 | A. I stayed at Bishop Ranch for probably -- |
| 11:32 | 15 | anywhere from three to six months. I can't |
| 11:32 | 16 | remember. It wasn't a very long time. It wasn't a |
| 11:32 | 17 | year. |
| 11:32 | 18 | Q. So you were hired in April 2003. And |
| 11:32 | 19 | when -- did you start work right away in April 2003 |
| 11:32 | 20 | at Bishop Ranch or was there some lag time? |
| 11:32 | 21 | A. I think I worked -- I started right away, |
| 11:32 | 22 | maybe the following week. It wasn't a long time. |
| 11:32 | 23 | Q. Within a week of being hired? |
| 11:32 | 24 | A. Right. I think so, yes. |
| 11:32 | 25 | Q. And you were either at day or swing shift |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 36

| | | |
|---|---|---|
| 11:42 | 1 | California has a presumption of at-will employment? |
| 11:42 | 2 | A.   Yes. |
| 11:42 | 3 | Q.   And you never signed a contract for a |
| 11:42 | 4 | specific term of employment at The Wackenhut |
| 11:42 | 5 | Corporation, right? |
| 11:42 | 6 | A.   No. |
| 11:42 | 7 | Q.   And you understood from your experience at |
| 11:42 | 8 | Acufacts Security that the nature of the security |
| 11:42 | 9 | contract -- I'm sorry.  Let me strike that. |
| 11:42 | 10 | You understood from your experience at |
| 11:42 | 11 | Acufacts Security that transfers are a part of the |
| 11:42 | 12 | nature of the business in the security industry, |
| 11:42 | 13 | right? |
| 11:42 | 14 | A.   Yes. |
| 11:42 | 15 | Q.   And you -- when you were hired, did anyone |
| 11:42 | 16 | at Wackenhut explain to you or give you any |
| 11:43 | 17 | paperwork that indicated that you didn't have a |
| 11:43 | 18 | vested interest in any specific post or assignment, |
| 11:43 | 19 | shift, day, or swing, something like that? |
| 11:43 | 20 | A.   Well, my understanding with security, in |
| 11:43 | 21 | general -- I've been in security for almost 20 |
| 11:43 | 22 | years, probably 20 years.  If they don't have a |
| 11:43 | 23 | reason to move you, they don't move you. |
| 11:43 | 24 | Q.   But no one has sort of a vested right to |
| 11:43 | 25 | any specific post or assignment, right, it's up to |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 39

| | | |
|---|---|---|
| 11:46 | 1 | A.    Yes. |
| 11:46 | 2 | Q.    Let me finish.  Those are the handwritten |
| 11:46 | 3 | notes on the 2005 calendar you carried in your |
| 11:46 | 4 | portfolio? |
| 11:46 | 5 | A.    Yes. |
| 11:46 | 6 | Q.    Take a look at Exhibit 4 and confirm for |
| 11:46 | 7 | me these are true and correct copies of your |
| 11:46 | 8 | handwritten notes in the spiral binder that you |
| 11:47 | 9 | carried in your portfolio in 2005? |
| 11:47 | 10 | A.    Yes. |
| 11:47 | 11 | Q.    Okay.  Great.  So you were on assignment |
| 11:47 | 12 | at Bishop Ranch, you can't remember if you worked |
| 11:47 | 13 | day or swing, you worked there about six months, |
| 11:47 | 14 | right? |
| 11:47 | 15 | A.    Yes, but I think it was in the middle of |
| 11:47 | 16 | the day.  I think I came in right before 12:00 and |
| 11:47 | 17 | I stayed until 6:00.  It was the middle of the |
| 11:47 | 18 | shift, like that. |
| 11:48 | 19 | Q.    And your best recollection is your rate of |
| 11:48 | 20 | pay was about $9.50 an hour, yes? |
| 11:48 | 21 | A.    Yes, that was the case. |
| 11:48 | 22 | Q.    And you indicated you were on a temporary |
| 11:48 | 23 | assignment at a door, so was that a fixed post? |
| 11:48 | 24 | A.    I'm sorry to sound naive, but what do you |
| 11:48 | 25 | mean "fixed post"? |

07

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 40

| 11:48 | 1 | Q.   In other words, you weren't a rover, a |
|---|---|---|

11:48   1      Q.   In other words, you weren't a rover, a

11:48   2   driver, a dispatcher, you were standing post?

11:48   3      A.   Yes, that was a fixed post.

11:48   4      Q.   Okay.  And you indicated it was temporary.

11:48   5   What did you mean by that, that it was temporary

11:48   6   for you or that the actual post assignment was a

11:48   7   temporary one at Bishop Ranch Chevron?

11:48   8      A.   I was doing the 9/11, I believe.  It was

11:48   9   temporary; it wasn't a permanent post.

11:49   10      Q.   So after the September 11 attacks, there

11:49   11   was an additional measure of security added and you

11:49   12   were working that temporary post?

11:49   13      A.   Yes.

11:49   14      Q.   Okay.  And then you were transferred to a

11:49   15   different Chevron site by The Wackenhut

11:49   16   Corporation?

11:49   17      A.   Yes.

11:49   18      Q.   Which site did you transfer to?

11:49   19      A.   Concord.

11:49   20      Q.   And that's known by The Wackenhut

11:49   21   Corporation as -- what's its name, is it Chevron

11:49   22   Concord, how is it referred to?

11:49   23      A.   Chevron Concord.

11:49   24      Q.   Okay.  And how did that transfer occur?

11:49   25   In other words, what prompted the transfer, did you

JAMES SETTLE

08

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 44

| | | |
|---|---|---|
| 11:53 | 1 | A.   I hadn't spoke with her since I left. |
| 11:53 | 2 | Q.   Since you left what, Chevron Concord? |
| 11:53 | 3 | A.   No, not Chevron Concord.  I hadn't spoken |
| 11:53 | 4 | to -- I still work for the company, so I can't say |
| 11:53 | 5 | since I -- I can't recall when she left. |
| 11:54 | 6 | Q.   Since she left the company? |
| 11:54 | 7 | A.   It's been a long -- I haven't spoken to |
| 11:54 | 8 | her -- we'll put it like this, in maybe a year and |
| 11:54 | 9 | a half, two years. |
| 11:54 | 10 | Q.   Did I hear you correctly you're still |
| 11:54 | 11 | employed with The Wackenhut Corporation? |
| 11:54 | 12 | A.   Yeah. |
| 11:54 | 13 | Q.   And what's your current rate of pay with |
| 11:54 | 14 | The Wackenhut Corporation? |
| 11:54 | 15 | A.   $14.50. |
| 11:54 | 16 | Q.   And how long have you had that hourly |
| 11:54 | 17 | rate? |
| 11:54 | 18 | A.   It started maybe two months ago. |
| 11:54 | 19 | Q.   So you received a raise about two months |
| 11:54 | 20 | ago? |
| 11:54 | 21 | A.   I don't know if I can call it a raise. |
| 11:54 | 22 | It's supposed to be a raise, but it don't reflect |
| 11:54 | 23 | on the check.  It's still at the old rate, and then |
| 11:54 | 24 | it's adjustment.  So it's not -- they don't have it |
| 11:55 | 25 | as the base pay yet.  They just adjust it every |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 46

| | | |
|---|---|---|
| 11:56 | 1 | A. Yes. It was towards the end of the year. |
| 11:56 | 2 | I remember that. It was maybe in November -- |
| 11:56 | 3 | October or November, something like that. |
| 11:56 | 4 | Q. So October/November is what, when you |
| 11:56 | 5 | left -- |
| 11:56 | 6 | A. Started work at Concord. |
| 11:56 | 7 | Q. And there was a two-week gap, you said, |
| 11:56 | 8 | between the time you left Bishop Ranch and the time |
| 11:56 | 9 | you started working at Chevron Concord? |
| 11:56 | 10 | A. A two-week gap? |
| 11:56 | 11 | Q. Yes. |
| 11:56 | 12 | A. No, it was longer than that, I believe. |
| 11:56 | 13 | Q. What was the gap? |
| 11:56 | 14 | A. I don't know. |
| 11:56 | 15 | Q. Can you give me your best estimate? |
| 11:56 | 16 | A. It may have been a month and a half. |
| 11:57 | 17 | These are guesses. I don't keep this stuff in my |
| 11:57 | 18 | head. Once it happens, it leaves my mind. |
| 11:57 | 19 | Q. Okay. But you have a recollection of you |
| 11:57 | 20 | starting at Chevron Concord in |
| 11:57 | 21 | October/November 2003? |
| 11:57 | 22 | A. Possibly. |
| 11:57 | 23 | Q. And what shift were you assigned to work |
| 11:57 | 24 | at Chevron Concord? |
| 11:57 | 25 | A. I worked the swing shift. |

10

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 47

| | | |
|---|---|---|
| 11:57 | 1 | Q. And how long did you remain at Chevron |
| 11:57 | 2 | Concord on the swing shift? |
| 11:57 | 3 | A. I think I was there approximately a year. |
| 11:57 | 4 | Q. And who was your supervisor at Chevron |
| 11:58 | 5 | Concord? |
| 11:58 | 6 | A. It was Ron Harper, but I think Bonnie |
| 11:58 | 7 | Sutterfield was his boss. I never knew that until |
| 11:58 | 8 | I went over to San Ramon. |
| 11:58 | 9 | Q. Okay. Let's help out the court reporter a |
| 11:58 | 10 | little bit. Your immediate supervisor was Ron |
| 11:58 | 11 | Harper, did you say? |
| 11:58 | 12 | A. Ron Harper. |
| 11:58 | 13 | Q. Could have you spell that. |
| 11:58 | 14 | A. I think it's H-a-r-p-e-r. |
| 11:58 | 15 | Q. Ron Harper. Okay. And what was |
| 11:58 | 16 | Mr. Harper's position at Chevron Concord? |
| 11:58 | 17 | A. Or was it Don Harper? It was something. |
| 11:58 | 18 | It might have been Don. I can't remember if it was |
| 11:58 | 19 | Don or Ron. |
| 11:58 | 20 | Q. I'm sorry. You can't remember now |
| 11:58 | 21 | Mr. Harper's first name? |
| 11:58 | 22 | A. I can't remember if it was Ron or Don. |
| 11:58 | 23 | Q. Oh, Don or Ron. Okay. But do you know |
| 11:58 | 24 | Mr. Harper's position, was he a sergeant, a |
| 11:59 | 25 | supervisor, what was his title? |

11

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 49

| | | |
|---|---|---|
| 12:00 | 1 | late? |
| 12:00 | 2 | A.    Yes.  They were tardy. |
| 12:00 | 3 | Q.    Okay. |
| 12:00 | 4 | A.    They would call off all the time.  And the |
| 12:00 | 5 | only other thing is when I -- when they came to -- |
| 12:00 | 6 | because I lived in Pleasanton and I got caught in |
| 12:00 | 7 | traffic sometimes.  And they made a big deal out of |
| 12:01 | 8 | it sometimes. |
| 12:01 | 9 | Q.    Who made a big deal of it, Mr. Harper? |
| 12:01 | 10 | A.    Not per se, Mr. Harper, but some of the |
| 12:01 | 11 | supervisors. |
| 12:01 | 12 | Q.    Were you ever disciplined for being late |
| 12:01 | 13 | when you worked at Chevron Concord? |
| 12:01 | 14 | A.    Yes, once. |
| 12:01 | 15 | Q.    Who disciplined you? |
| 12:01 | 16 | A.    It was Mr. Harper -- no, it was |
| 12:01 | 17 | Mr. Jackson. |
| 12:01 | 18 | Q.    What's Mr. Jackson's first name? |
| 12:01 | 19 | A.    All I remember is Lt. Jackson.  I can't |
| 12:01 | 20 | remember his first name. |
| 12:01 | 21 | Q.    Do you know what race Lt. Jackson is? |
| 12:01 | 22 | A.    Yes, he was an African American guy. |
| 12:01 | 23 | Q.    So you didn't feel Mr. Lt. Jackson's |
| 12:02 | 24 | discipline of you was racially motivated? |
| 12:02 | 25 | A.    No. |

12

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 50

| | | |
|---|---|---|
| 12:02 | 1 | Q.    And what site did you work for TWC after |
| 12:02 | 2 | Chevron Concord? |
| 12:02 | 3 | A.    Then I went to Chevron Park in San Ramon. |
| 12:02 | 4 | Q.    It's called Chevron Park? |
| 12:02 | 5 | A.    Yes. |
| 12:02 | 6 | Q.    And what was your hourly rate of pay when |
| 12:02 | 7 | you worked at Chevron Concord? |
| 12:02 | 8 | A.    I think it was $10.25 an hour. |
| 12:02 | 9 | Q.    And did you receive any benefits when you |
| 12:02 | 10 | worked at Chevron Concord? |
| 12:02 | 11 | A.    I guess the regular benefits, insurance, |
| 12:02 | 12 | hospitalization.  That's about all I know. |
| 12:02 | 13 | Q.    Did they change in any material way, in |
| 12:02 | 14 | any substantial way from the time you worked at |
| 12:03 | 15 | Chevron Bishop Ranch? |
| 12:03 | 16 | A.    Did they change? |
| 12:03 | 17 | Q.    Did they change between Chevron Bishop |
| 12:03 | 18 | Ranch and Chevron Concord, your benefits? |
| 12:03 | 19 | A.    Okay.  If they did, I don't know. |
| 12:03 | 20 | Q.    It wasn't anything memorable or |
| 12:03 | 21 | substantial? |
| 12:03 | 22 | A.    No. |
| 12:03 | 23 | Q.    Okay.  Can you give me your best estimate |
| 12:03 | 24 | of when you started at Chevron Park at San Ramon? |
| 12:03 | 25 | A.    I don't remember that date either. |

13

JAMES SETTLE

Page 52

| | | |
|---|---|---|
| 12:04 | 1 | Q.   Eight months. |
| 12:04 | 2 | A.   I remember that. |
| 12:04 | 3 | Q.   And by "anything happening," you mean |
| 12:04 | 4 | anything happening that forms the basis for your |
| 12:05 | 5 | lawsuit? |
| 12:05 | 6 | A.   Yes. |
| 12:05 | 7 | Q.   And what was your starting salary when you |
| 12:05 | 8 | transferred to Chevron Park? |
| 12:05 | 9 | A.   It was $10.25. |
| 12:05 | 10 | Q.   Okay.  And what shift were you working at |
| 12:05 | 11 | Chevron Park? |
| 12:05 | 12 | A.   Swing. |
| 12:05 | 13 | Q.   Did you work swing -- |
| 12:05 | 14 | A.   Well, it started off temporary.  I was |
| 12:05 | 15 | temporary.  I wasn't permanent there. |
| 12:05 | 16 | Q.   What prompted the transfer from Chevron |
| 12:05 | 17 | Concord to Chevron Park? |
| 12:05 | 18 | A.   Because they were going to close parts of |
| 12:05 | 19 | Chevron Park and they wanted to decrease the |
| 12:05 | 20 | security for us, so they doubled some shifts and |
| 12:05 | 21 | they had extra offices.  And so they -- they moved |
| 12:05 | 22 | some of us. |
| 12:05 | 23 | Q.   So they were looking to close Chevron |
| 12:05 | 24 | Park.  What do you mean by close Chevron Park? |
| 12:06 | 25 | A.   Certain buildings, certain departments is |

JAMES SETTLE

14

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 53

| | |
|---|---|
| 12:06 | 1 |

what it was.

12:06  2     Q.   So Chevron was --

12:06  3     A.   Downsizing.

12:06  4     Q.   -- downsizing.  And they needed extra

12:06  5   security at Chevron Park?

12:06  6     A.   No, there was just an opening at Chevron

12:06  7   Park.  Well, they need -- Chevron Park needs help

12:06  8   all the time.  I just happened to work there part

12:06  9   time, and then became permanent later.

12:06  10    Q.   And you understand that TWC had the right

12:06  11   to transfer you to work part time on occasion as

12:06  12   needed at Chevron Park from Chevron Concord?

12:06  13    A.   Yes.

12:06  14    Q.   Okay.  And your rate of pay remained the

12:06  15   same when you first transferred, right?

12:06  16    A.   Yes.

12:06  17    Q.   Did your benefits change at all in any

12:06  18   substantial way from Chevron Concord to Chevron

12:06  19   Park?

12:06  20    A.   Like I said, I don't even know what they

12:06  21   were.  If they did, they did.  I don't recall what

12:06  22   happened.  I wasn't paying attention to the

12:07  23   benefits.

12:07  24    Q.   It didn't stick out in your mind as any

12:07  25   material change to your benefits from Concord to

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 54

| | | |
|---|---|---|
| 12:07 | 1 | Chevron Park? |
| 12:07 | 2 | A.   No.   If they did, they did. |
| 12:07 | 3 | Q.   What posts did you typically work at |
| 12:07 | 4 | Chevron Concord on swing? |
| 12:07 | 5 | A.   I was a receptionist and a rover. |
| 12:07 | 6 | Q.   And can you describe the duties of a |
| 12:07 | 7 | rover? |
| 12:07 | 8 | A.   Okay.   Check the perimeter.   Check the |
| 12:07 | 9 | fence lines.   Check the buildings.   And just make |
| 12:08 | 10 | sure no strange person is on the property, you |
| 12:08 | 11 | know. |
| 12:08 | 12 | Q.   So it's a mobile position? |
| 12:08 | 13 | A.   It was a mobile, outside position. |
| 12:08 | 14 | Q.   And are you walking the perimeter or are |
| 12:08 | 15 | you going to be -- |
| 12:08 | 16 | A.   I could be walking or I could be in an |
| 12:08 | 17 | electric vehicle. |
| 12:08 | 18 | Q.   Were you ever disciplined for being tardy |
| 12:08 | 19 | when you were assigned to work security for Chevron |
| 12:08 | 20 | Concord? |
| 12:08 | 21 | A.   Yes.   You asked me that once already. |
| 12:08 | 22 | Yes.   Chevron Concord? |
| 12:08 | 23 | Q.   Yes. |
| 12:08 | 24 | A.   Yes. |
| 12:08 | 25 | Q.   That was by Mr. Harper? |

16

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 55

| 12:08 | 1 | A.    No, it was by Mr. Jackson. |

12:08    2        Q.    Mr. Jackson.  I'm sorry.  You're right.

12:08    3              What was the reasons behind some of your

12:08    4    tardies?

12:08    5        A.    I was -- like I said, the traffic would

12:09    6    get me sometimes.  It wasn't the same every day.

12:09    7        Q.    And when did you move from Pleasanton to

12:09    8    Livermore?

12:09    9        A.    That was in May.

12:09    10       Q.    May of 2005?

12:09    11       A.    No.

12:09    12       Q.    2004?

12:09    13       A.    No.  It was last May.

12:09    14       Q.    Oh, May 2007?

12:09    15       A.    Right.

12:09    16       Q.    Okay.  During all of the events that are

12:09    17   relevant to this lawsuit, you were living in

12:09    18   Pleasanton?

12:09    19       A.    Yes.

12:09    20       Q.    And what was your address in Pleasanton?

12:09    21       A.    I had several addresses.

12:09    22       Q.    What was your last address in Pleasanton?

12:09    23       A.    My last address I cannot remember.  It

12:09    24   was -- I can remember the street was Arroyo.

12:10    25   That's all I remember.  I don't remember the

JAMES SETTLE

17

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 62

```
12:18    1    longer pursuing your goal of being a CPA?
12:18    2         A.   I don't know how to answer that question,
12:18    3    because I'm pursuing it, but at my age, I don't
12:18    4    know.  I don't know if that's ever going to happen.
12:18    5         Q.   Okay.  All right.  Going back to your time
12:18    6    at Chevron Concord, we discussed the reasons for
12:18    7    your transfer to Chevron Park.  And that was at the
12:18    8    initiative of the The Wackenhut Corporation, right,
12:18    9    based on the needs at Chevron Park?
12:19   10         A.   Yes.
12:19   11         Q.   And was that Mr. Lipman who made that
12:19   12    decision?
12:19   13         A.   You could say this, but I wasn't
12:19   14    speaking -- I was speaking with Ms. Rose.
12:19   15         Q.   I don't want it to be me saying that.  I
12:19   16    want to understood who was it who made the decision
12:19   17    to move you from Chevron Concord to Chevron Park?
12:19   18         A.   I was communicating with Ms. Rose.
12:19   19         Q.   Okay.  So was it Ms. Rose's decision or
12:19   20    was it collaborative between you and Ms. Rose?
12:19   21         A.   Well, Ms. Rose was human resources.  She
12:19   22    sent me over to interview with Ms. Bonnie.
12:19   23         Q.   Bonnie Sutterfield?
12:19   24         A.   Yes.
12:19   25         Q.   Okay.
```

18

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 63

| 12:19 | 1 | A.    And I interviewed with her. |

12:19    1        A.    And I interviewed with her.

12:19    2        Q.    And at the time do you know what Bonnie

12:19    3    Sutterfield's position was with Chevron?

12:19    4        A.    She was the manager at Chevron.    Chevron

12:19    5    Park.

12:19    6        Q.    And at that time was she a TWC employee?

12:20    7        A.    Yes.

12:20    8        Q.    Okay.    When did the interview with Bonnie

12:20    9    Sutterfield take place in connection with your

12:20    10    transfer to Chevron Park?

12:20    11        A.    It took place the early part of 2005, I

12:20    12    believe.

12:20    13        Q.    Okay.    And Ms. Sutterfield knew you from

12:20    14    your work in security on the swing shift at Chevron

12:20    15    Concord, right?

12:20    16        A.    No, she didn't -- say that again.    I

12:20    17    didn't hear what you said.

12:20    18            MR. WAGNER:    Can we have the last question

12:20    19    read back.

12:20    20            (Record read as follows:

         21            Question:    "Okay.    And

         22            Ms. Sutterfield knew you from your

         23            work in security on the swing shift

12:20    24            at Chevron Concord, right?")

12:20    25            THE WITNESS:    Yes.    Yes, she knew me -- as

JAMES SETTLE

19

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 64

| 12:21 | 1 | a matter of fact, she was -- I was referred to her |
| 12:21 | 2 | by Mr. Harper.  He told her I had a great work |
| 12:21 | 3 | history, but I would run late.  And we talked about |
| 12:21 | 4 | tardiness. |
| 12:21 | 5 | And she said that, you know, she had -- |
| 12:21 | 6 | she had problems already with some other people in |
| 12:21 | 7 | there.  She needed -- I would have to be there on |
| 12:21 | 8 | time.  And then we went from there. |
|  | 9 | BY MR. WAGNER: |
| 12:21 | 10 | Q.   What you just described, the discussion |
| 12:21 | 11 | with Ms. Sutterfield, that was the substance of the |
| 12:21 | 12 | conversation during your interview? |
| 12:21 | 13 | A.   During the interview. |
| 12:21 | 14 | Q.   During the interview as part of your |
| 12:21 | 15 | transfer to Chevron Park? |
| 12:22 | 16 | A.   Yes. |
| 12:22 | 17 | MR. WAGNER:  All right.  Why don't we go |
| 12:22 | 18 | off the record for a second. |
| 12:22 | 19 | (Lunch break.) |
| 01:13 | 20 | BY MR. WAGNER: |
| 01:13 | 21 | Q.   All right.  Mr. Settle, you know that even |
| 01:14 | 22 | though we've taken a break, you're still under oath |
| 01:14 | 23 | here? |
| 01:14 | 24 | A.   Yes. |
| 01:14 | 25 | Q.   Okay.  And you produced a number of |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 73

| | | |
|---|---|---|
| 01:25 | 1 | Corporation? |
| 01:25 | 2 | A.    But I left -- |
| 01:25 | 3 | Q.    We'll get there.  Are you still an |
| 01:25 | 4 | employee of the The Wackenhut Corporation? |
| 01:25 | 5 | A.    Yes. |
| 01:25 | 6 | Q.    Okay.  And you're now working -- at which |
| 01:25 | 7 | client of TWC are you working at, which site? |
| 01:25 | 8 | A.    I work for GE Vallecitos Nuclear. |
| 01:25 | 9 | Q.    Can you spell the Vallecitos part? |
| 01:25 | 10 | A.    I have to look it up to do.  I don't think |
| 01:25 | 11 | I have -- or do I? |
| 01:25 | 12 | Q.    Let's see if we can locate that. |
| 01:25 | 13 | A.    It's V-a-l-l-e-c-i-t-o-s Nuclear Center. |
| 01:25 | 14 | Q.    GE Vallecitos Nuclear Center? |
| 01:25 | 15 | A.    Correct. |
| 01:25 | 16 | Q.    You're currently employed by The Wackenhut |
| 01:25 | 17 | Corporation performing security officer services at |
| 01:25 | 18 | the GE Vallecitos Nuclear Center? |
| 01:26 | 19 | A.    Correct. |
| 01:26 | 20 | Q.    And where is that located? |
| 01:26 | 21 | A.    Sonol. |
| 01:26 | 22 | Q.    Sonol, S-o-n-o-l? |
| 01:26 | 23 | A.    Yes. |
| 01:26 | 24 | Q.    And how far from your home in Livermore is |
| 01:26 | 25 | that? |

21

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 74

| | | |
|---|---|---|
| 01:26 | 1 | A.    About 10 or 15 miles. |
| 01:26 | 2 | Q.    And how far is the Sonol facility from |
| 01:26 | 3 | your residence in Pleasanton? |
| 01:26 | 4 | A.    As a matter of fact, it was closer.  It's |
| 01:26 | 5 | adjacent to Pleasanton, so it was closer. |
| 01:26 | 6 | Q.    So we were talking about the documents |
| 01:26 | 7 | that you retrieved in the case and produced in the |
| 01:26 | 8 | case.  And you spoke to Tim Rocca, right? |
| 01:26 | 9 | A.    Right. |
| 01:26 | 10 | Q.    Did he give you any documents? |
| 01:26 | 11 | A.    No, he didn't give me any documents.  He |
| 01:26 | 12 | gave me a statement. |
| 01:26 | 13 | Q.    He gave you a witness statement? |
| 01:26 | 14 | A.    Yes. |
| 01:26 | 15 | Q.    But he didn't give you any internal |
| 01:27 | 16 | documents from the company, any e-mails or |
| 01:27 | 17 | anything? |
| 01:27 | 18 | A.    No, he didn't. |
| 01:27 | 19 | Q.    Would it be fair to say your main source |
| 01:27 | 20 | of e-mails and internal documents was Mr. Deloach |
| 01:27 | 21 | and also Mr. Goldman, both? |
| 01:27 | 22 | A.    It was Mr. Deloach and Alberto Perez. |
| 01:27 | 23 | Q.    What did Alberto Perez give you? |
| 01:27 | 24 | A.    He didn't -- he gave me what he had. |
| 01:27 | 25 | Q.    What do you mean by "he had"? |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 86

01:43  1        Q.    What was Art Talley's position at The

01:43  2   Wackenhut Corporation?

01:43  3        A.    He was a supervisor.

01:43  4        Q.    All right.   Let's start with Janice

01:43  5   Woelffer.   Can you tell me what statements she said

01:43  6   about you that you consider slanderous?

01:43  7        A.    She accused me of messing up the carts and

01:43  8   having documentation -- other documentation in the

01:44  9   cart and having food in the cart when, as a fact,

01:44  10  she delivers food in the cart herself all the time.

01:44  11  There was no place -- we didn't have a lunchroom,

01:44  12  and that was my lunch.

01:44  13        And then she accused me of having other

01:44  14  literature in the cart when she didn't even look in

01:44  15  the case.   I used to -- it was another case.   I

01:44  16  used to carry my emergency procedures in another

01:44  17  bag.   She accused me -- she said that that was

01:44  18  other literature.   She never looked at it.   She

01:44  19  never opened it up.   And when I tried to tell her,

01:44  20  she cut me off.

01:44  21        Q.    Okay.

01:44  22        A.    And she accused me -- also she accused me

01:45  23  for not preparing my DAR when I couldn't prepare my

01:45  24  DAR.   She said I was supposed to do it at the

01:45  25  beginning of my shift, and I didn't do it.   And I

JAMES SETTLE

23

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 87

01:45  1    couldn't do it, because I was given assignments and

01:45  2    when my assignments stopped, I did my DAR at the

01:45  3    beginning of my shift all the time.

01:45  4        Q.    Okay.  Let's step back.  Janice Woelffer,

01:45  5    what was her position at TWC?

01:45  6        A.    You know what, I don't know.  I think she

01:45  7    was Bonnie's assistant.  That's all I ever heard.

01:45  8        Q.    Was she in a supervisory capacity over

01:45  9    you?

01:45  10       A.    Yes.

01:45  11       Q.    But you don't remember her title?

01:45  12       A.    All she'd ever say was she was second

01:45  13   under Bonnie.  She was hired to be Bonnie's helper.

01:45  14   So I don't know.  Assistant manager of Bonnie.  I

01:45  15   don't know what her title was.

01:46  16       Q.    She reported to Bonnie Sutterfield?

01:46  17       A.    Right.

01:46  18       Q.    Okay.  Did she work in some sort of

01:46  19   administrative/managerial capacity?

01:46  20       A.    Yes.

01:46  21       Q.    And when was this conversation -- when

01:46  22   were these statements that you just described as

01:46  23   false or slanderous made by Ms. Woelffer?

01:46  24       A.    I don't know what date it was.  I don't

01:46  25   know when -- I have no idea what date it was.  It's

24

JAMES SETTLE

Page 90

| | | |
|---|---|---|
| 01:48 | 1 | Q.    How do you know that she told Art Talley |
| 01:48 | 2 | these four statements, that you were messing up the |
| 01:48 | 3 | carts, you had literature, were not reporting your |
| 01:48 | 4 | DARs accurately, and that -- let's see -- yeah, I |
| 01:49 | 5 | guess those were the... |
| 01:49 | 6 | The four statements that you attribute to |
| 01:49 | 7 | Ms. Woelffer, the four slanderous statements were |
| 01:49 | 8 | that you had lunch in your cart, that you had |
| 01:49 | 9 | noncompany literature in the cart, you messed up |
| 01:49 | 10 | the cart, and that your DAR was not accurate, |
| 01:49 | 11 | right, those are the four statements? |
| 01:49 | 12 | A.    What she said it wasn't that it wasn't |
| 01:49 | 13 | accurate, it wasn't done. |
| 01:49 | 14 | Q.    It wasn't done right.  How do you know she |
| 01:49 | 15 | made these statements to Art Talley? |
| 01:49 | 16 | A.    Because Art put it in a writeup.  He said |
| 01:49 | 17 | all these things in a writeup. |
| 01:49 | 18 | Q.    Do you have that writeup? |
| 01:49 | 19 | A.    And then she said -- because she came to |
| 01:49 | 20 | see was I unshaved; that was one of the reasons. |
| 01:50 | 21 | He told her I was unshaved. |
| 01:50 | 22 | Q.    So the date of the statements by |
| 01:50 | 23 | Ms. Woelffer was the date that you got in trouble |
| 01:50 | 24 | for being unshaved? |
| 01:50 | 25 | A.    It happened on December the 29th, I |

25

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 93

01:53  1      Q.   So I understand it, the slanderous

01:53  2   statement that you attribute to Ms. Sutterfield in

01:53  3   this case, the first one is her future promise that

01:53  4   she would consider you for a position in the

01:53  5   control room, right?

01:53  6      A.   You said Ms. -- you're talking about

01:53  7   Ms. Sutterfield?

01:53  8      Q.   Yes.  Isn't that who we're talking about?

01:53  9      A.   Yes, that was -- that was one of them.

01:53  10     Q.   Okay.  And what's the next one?

01:53  11     A.   And another time -- I don't know if you

01:53  12  call this -- this would be slander.  But she had me

01:53  13  to prepare for an interview for a week, and then

01:54  14  when I went in for the interview, the day that I

01:54  15  went in for the interview, the person was already

01:54  16  hired.  They were -- I was getting out of my car,

01:54  17  passing the person who had the job, and was being

01:54  18  trained for the job.

01:54  19          And I was drilled for two hours in the

01:54  20  interview and never was going to get the position.

01:54  21  So she told me -- I mean --

01:54  22     Q.   But she never made a false statement about

01:54  23  you in connection with the job, right, in

01:54  24  connection with the position?

01:54  25     A.   No, she told me that I was being

26

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 94

01:54   1    considered.

01:54   2        Q.   Right.

01:54   3        A.   She said I had a chance to get the job.

01:54   4        Q.   And did anyone else hear her say that to

01:54   5    you?

01:54   6        A.   Anybody else?  I was being interviewed.

01:54   7    It was understood that I was a candidate.  If

01:54   8    somebody is already hired and she's still allowing

01:55   9    me to go be interviewed for two hours, isn't that

01:55   10   some type of contradiction?

01:55   11       Q.   Okay.  All right.  As I understand it, the

01:55   12   allegation you have against Ms. Sutterfield for

01:55   13   slander relates to her future promise that you'd be

01:55   14   a candidate for promotion, right?

01:55   15       A.   Yes.

01:55   16       Q.   Is that accurate, surrounds that whole

01:55   17   circumstance?

01:55   18       A.   Yes.  And she also told me in the

01:55   19   interview after she hired the other person, a week

01:55   20   later, after I had been interviewed, she told me

01:55   21   that she would consider me as a part time sergeant,

01:55   22   I could work in that capacity.

01:55   23       Q.   Okay.  So she also --

01:55   24       A.   And she never did that.

01:55   25       Q.   Part of your slander complaint against

27

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 96

| | | |
|---|---|---|
| 01:57 | 1 | Q.   Let's be more specific here.  What did |
| 01:57 | 2 | Dale Schmidt say about you that was false? |
| 01:57 | 3 | A.   Dale Schmidt, first of all, wrote an |
| 01:57 | 4 | e-mail saying that I was going -- I was being |
| 01:57 | 5 | called for escort.  I remember this.  I was called |
| 01:57 | 6 | to the G, I believe.  The G building. |
| 01:57 | 7 | Q.   G building? |
| 01:57 | 8 | A.   Yes.  He said that I went to the wrong |
| 01:57 | 9 | building and the -- that the client was waiting on |
| 01:57 | 10 | me, and it took me 15 minutes or so to get there. |
| 01:57 | 11 | I went straight to the client, picked her up and |
| 01:58 | 12 | escorted her to her car.  That was not true. |
| 01:58 | 13 | He wrote an e-mail to Bonnie saying this. |
| 01:58 | 14 | He also -- |
| 01:58 | 15 | Q.   Hold on.  When was this e-mail written? |
| 01:58 | 16 | A.   It was written sometime in January 2005. |
| 01:58 | 17 | Q.   So sometime in January 2005, Dale Schmidt |
| 01:58 | 18 | writes an e-mail that you claim was false -- |
| 01:58 | 19 | contains a false statement about you regarding your |
| 01:58 | 20 | being late to pick up a client? |
| 01:58 | 21 | A.   Yes.  And that wasn't true. |
| 01:58 | 22 | Q.   And was that made with malice? |
| 01:58 | 23 | A.   Yes.  Not only that, he videotaped me and |
| 01:58 | 24 | said I was undressing in front of clients driving |
| 01:58 | 25 | by, in which my relief was late, and I was only |

JAMES SETTLE

28

Page 97

| | | |
|---|---|---|
| 01:59 | 1 | taking clothing -- there's a camera inside the |
| 01:59 | 2 | guard shed.  It's dark in the guard shed.  You |
| 01:59 | 3 | can't see in there.  It was after-hours. |
| 01:59 | 4 | It was after 10 o'clock.  And I was going |
| 01:59 | 5 | to go to the gym, and I had my gym clothes under my |
| 01:59 | 6 | clothes.  And I didn't want to go back to the |
| 01:59 | 7 | building, because the guard shack is out towards |
| 01:59 | 8 | the street.  And I didn't want to come back to the |
| 01:59 | 9 | building and miss my relief, because it was 20 |
| 01:59 | 10 | minutes late. |
| 01:59 | 11 | Q.   So Dale Schmidt's statement was true that |
| 01:59 | 12 | you were changing in the guard shack? |
| 01:59 | 13 | A.   I was shedding clothing.  I had my clothes |
| 01:59 | 14 | under my clothes.  He never talked to me about it. |
| 01:59 | 15 | He videotaped me, which was against company policy. |
| 01:59 | 16 | He videotaped it and showed it to everybody to try |
| 02:00 | 17 | to get a negative response. |
| 02:00 | 18 | Q.   Okay. |
| 02:00 | 19 | A.   And I never knew anything about it until |
| 02:00 | 20 | Ron Deloach was talking to me in a conversation, |
| 02:00 | 21 | which he thought I knew about it, and I never did. |
| 02:00 | 22 | Q.   What about the statement by Mr. Schmidt |
| 02:00 | 23 | was untrue? |
| 02:00 | 24 | A.   He said the clients were driving by; there |
| 02:00 | 25 | was no clients driving by. |

29

JAMES SETTLE

Page 98

| | | |
|---|---|---|
| 02:00 | 1 | Q.   Maybe he was innocently mistaken as to |
| 02:00 | 2 | whether someone was driving by? |
| 02:00 | 3 | A.   No, I don't think so.  I mean, I was -- it |
| 02:00 | 4 | was walls.  I wasn't in front of the window. |
| 02:00 | 5 | Q.   And how do you know what Mr. -- what did |
| 02:00 | 6 | you attribute was Mr. Schmidt's motive in making |
| 02:00 | 7 | this statement? |
| 02:00 | 8 | A.   He was trying to -- he was trying to, you |
| 02:00 | 9 | know, make me look bad.  He was trying to make me |
| 02:00 | 10 | out to be a bad employee. |
| 02:00 | 11 | Q.   Any other false statements that |
| 02:01 | 12 | Mr. Schmidt made about you and you attribute as |
| 02:01 | 13 | slander and form the basis of your complaint here? |
| 02:01 | 14 | A.   He accused me of those 16 times being |
| 02:01 | 15 | tardy, when most of those -- some of them weren't |
| 02:01 | 16 | even tardy.  He also said that I was absent a lot, |
| 02:01 | 17 | which some of those was vacation days. |
| 02:01 | 18 | One of them was the day I got sick, and I |
| 02:01 | 19 | was told to go home.  I would have just stayed.  I |
| 02:01 | 20 | was actually told to leave, because the supervisor |
| 02:01 | 21 | said that they'd rather have somebody up there that |
| 02:01 | 22 | was complete, that wasn't sick, than to have |
| 02:01 | 23 | somebody up there sick. |
| 02:02 | 24 | Q.   So when did Mr. Schmidt make the false |
| 02:02 | 25 | statement concerning your 16 tardies or absences? |

30

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 99

| | | |
|---|---|---|
| 02:02 | 1 | A.    I probably would have -- let me see. |
| 02:02 | 2 | (Reading.) |
| 02:02 | 3 | Q.    About May 2005, does that sound right; is |
| 02:02 | 4 | that when you think it happened? |
| 02:03 | 5 | A.    I wouldn't have it.  This copy goes to |
| 02:03 | 6 | another packet.  I wouldn't have it with me.  That |
| 02:03 | 7 | goes to another packet.  And I don't know the other |
| 02:03 | 8 | part.  That's why I can't find it. |
| 02:03 | 9 | Q.    So is it your contention that you were |
| 02:03 | 10 | not -- you were not tardy 16 times? |
| 02:04 | 11 | A.    It was -- usually, if it's -- I should -- |
| 02:04 | 12 | it should have been brought to my attention the day |
| 02:04 | 13 | it happened.  You can't come back a year later and |
| 02:04 | 14 | say:  You were tardy 16 times.  It never was |
| 02:04 | 15 | brought to my attention. |
| 02:04 | 16 | Q.    It might have been unfair, but it wasn't |
| 02:04 | 17 | necessarily untrue, right? |
| 02:04 | 18 | A.    Yes, some of it was untrue. |
| 02:04 | 19 | Q.    But by and large, there was some merit to |
| 02:04 | 20 | the fact that you were tardy on occasion, right? |
| 02:04 | 21 | A.    Well, I was tardy.  Some of them was true, |
| 02:04 | 22 | but it wasn't 16 times. |
| 02:04 | 23 | Q.    Right. |
| 02:04 | 24 | A.    And it -- most of them was due to the fact |
| 02:04 | 25 | that -- |

31

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 107

| 02:14 | 1 | Dale Schmidt and Janice Woelffer never |
| 02:14 | 2 | physically confined you or kept you from leaving |
| 02:14 | 3 | any section -- |
| 02:14 | 4 | A.   I'm going to keep answering that question, |
| 02:14 | 5 | wait a minute.  I have to go back to my notes and |
| 02:14 | 6 | see why I put that there.  I did research, and I |
| 02:14 | 7 | probably ran on something that fit that |
| 02:14 | 8 | description.  You have to remember, I'm not an |
| 02:14 | 9 | attorney.  If the definition sounded like it fit |
| 02:14 | 10 | it, that's what was put there. |
| 02:14 | 11 | Q.   Okay.  So you put it there because you |
| 02:14 | 12 | were doing some research, but you don't have a |
| 02:14 | 13 | specific memory as you sit here today -- |
| 02:14 | 14 | A.   No, I don't. |
| 02:14 | 15 | Q.   You have to let me finish my question, |
| 02:14 | 16 | sir. |
| 02:14 | 17 | You don't have a specific memory as you |
| 02:14 | 18 | sit here today of Janice Woelffer or Bonnie |
| 02:14 | 19 | Sutterfield or Dale Schmidt physically confining |
| 02:14 | 20 | you, preventing you from freely moving about, |
| 02:15 | 21 | correct? |
| 02:15 | 22 | A.   Well, I couldn't leave.  I get off at |
| 02:15 | 23 | 10:00 o'clock. |
| 02:15 | 24 | Q.   Right.  You were working? |
| 02:15 | 25 | A.   I told you I get off at 10:00 o'clock and |

32

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 108

| | | |
|---|---|---|
| 02:15 | 1 | my relief wasn't there.  I couldn't leave until my |
| 02:15 | 2 | relief got there.  And they never told me that -- |
| 02:15 | 3 | that my relief would be that late. |
| 02:15 | 4 | Q.   And how did was your relief? |
| 02:15 | 5 | A.   My relief was almost 30 minutes late.  And |
| 02:15 | 6 | they knew that she would be 30 minutes late.  But |
| 02:15 | 7 | they never told me about it. |
| 02:15 | 8 | Q.   But they weren't physically with you at |
| 02:15 | 9 | the post, right? |
| 02:15 | 10 | A.   What do you mean? |
| 02:15 | 11 | Q.   They weren't with you there, they weren't |
| 02:15 | 12 | stopping you from leaving, but it was part of the |
| 02:15 | 13 | job that you were not supposed to leave -- |
| 02:15 | 14 | A.   The job -- |
| 02:15 | 15 | Q.   Let me finish, sir. |
| 02:16 | 16 | It was part of the job that you were not |
| 02:16 | 17 | supposed to leave your post until the relief got |
| 02:16 | 18 | there, right? |
| 02:16 | 19 | A.   That's correct. |
| 02:16 | 20 | Q.   They weren't standing there preventing you |
| 02:16 | 21 | from physically leaving, it was a function of your |
| 02:16 | 22 | position as a security officer at The Wackenhut |
| 02:16 | 23 | Corporation that you needed to wait to -- you |
| 02:16 | 24 | couldn't abandon your post, you needed to wait for |
| 02:16 | 25 | your relief, correct? |

33

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 109

| | | |
|---|---|---|
| 02:16 | 1 | A.   Yes. |
| 02:16 | 2 | Q.   Okay.  All right.  How were you |
| 02:16 | 3 | discriminated against on the basis of your age? |
| 02:16 | 4 | A.   Dale said -- I didn't hear him say it, but |
| 02:16 | 5 | other people heard him say it. |
| 02:16 | 6 | Q.   Heard who say what? |
| 02:16 | 7 | A.   He wanted to get rid of -- |
| 02:16 | 8 | Q.   Who are we talking about now, I'm sorry? |
| 02:16 | 9 | A.   Dale said he wanted -- |
| 02:16 | 10 | Q.   Dale? |
| 02:16 | 11 | A.   -- to get rid of all the old people.  He |
| 02:17 | 12 | didn't say what age, but he said he had too many |
| 02:17 | 13 | old people that he wanted to get rid of. |
| 02:17 | 14 | Q.   Who did he say that to? |
| 02:17 | 15 | A.   He said that to Deloach.  He said that to |
| 02:17 | 16 | Lou Mount.  And I think Garrison.  Richard |
| 02:17 | 17 | Garrison. |
| 02:17 | 18 | Q.   And were you the oldest security officer |
| 02:17 | 19 | at Chevron Park? |
| 02:17 | 20 | A.   No, I wasn't. |
| 02:17 | 21 | Q.   Who -- what other security officers were |
| 02:17 | 22 | older than you? |
| 02:17 | 23 | A.   There were maybe three others. |
| 02:17 | 24 | Q.   Three other security officers? |
| 02:17 | 25 | A.   Three or more. |

34

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

```
02:21   1    another Wackenhut site?
02:21   2        A.   That's what I'm trying to get to.  I was
02:21   3    off work for two weeks until I met with them.  We
02:21   4    had a meeting.  And they didn't have no work for
02:21   5    me, so they said -- he didn't know why he couldn't
02:21   6    send me back out there, he just told me, I'll give
02:21   7    you something else.  We'll wipe the slate clean.
02:21   8    And at that time I told him --
02:21   9        Q.   Who is making these statements?
02:21   10       A.   Harold Harris.
02:21   11       Q.   Harold Harris?
02:21   12       A.   He was the area manager at that time.  He
02:21   13   said that he would wipe the slate clean.  I told
02:22   14   him at that time that -- because I brought up
02:22   15   discrimination, that my union representative pulled
02:22   16   me outside in the hallway, told me if I say
02:22   17   anything about discrimination he wouldn't represent
02:22   18   me.
02:22   19       Q.   This is Chuck?
02:22   20       A.   Yeah, Chuck.  And I went back in there and
02:22   21   I told him -- I won't talk about it, but I'm never
02:22   22   going to forgot it, and I have to pursue it on my
02:22   23   own.  That's what I told Harold Harris that day.
02:22   24       Q.   And Harold Harris offered to pay you for
02:22   25   the two weeks that you'd been off from Chevron
```

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 113

| | | |
|---|---|---|
| 02:22 | 1 | Park, right? |
| 02:22 | 2 | A.   He didn't offer.  He paid me for the two |
| 02:22 | 3 | weeks. |
| 02:22 | 4 | Q.   Right.  You got paid those two weeks even |
| 02:22 | 5 | though you didn't work them, right? |
| 02:22 | 6 | A.   Yes, but not my full pay. |
| 02:22 | 7 | Q.   What was missing? |
| 02:22 | 8 | A.   He paid me a lower rate, I remember.  I |
| 02:22 | 9 | have to go back and pull the checks.  But he paid |
| 02:23 | 10 | me a lower rate.  And he didn't give me all the |
| 02:23 | 11 | hours that I would gotten, either.  He kind of |
| 02:23 | 12 | cheated me a little bit. |
| 02:23 | 13 | Q.   How much do you think he cheated you? |
| 02:23 | 14 | A.   I think he cheated me out of maybe $200. |
| 02:23 | 15 | Q.   Okay.  So you -- so you claim that the |
| 02:23 | 16 | compensation you received was $200 less than you |
| 02:23 | 17 | would have if you had been working at Chevron Park? |
| 02:23 | 18 | A.   If I would have worked. |
| 02:23 | 19 | Q.   Okay.  And then when did you next -- after |
| 02:23 | 20 | the meeting with Mr. Harris, that was in |
| 02:23 | 21 | San Francisco, right? |
| 02:23 | 22 | A.   Yes. |
| 02:23 | 23 | Q.   And do you remember the date? |
| 02:23 | 24 | A.   I think it was the 17th. |
| 02:23 | 25 | Q.   17th of May? |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 132

| | | |
|---|---|---|
| 02:53 | 1 | now these are -- |
| 02:53 | 2 | Q.   So he was excited about his promotion -- |
| 02:53 | 3 | A.   I don't know if he was excited or not, but |
| 02:53 | 4 | he told me that I need to get to my assignments on |
| 02:53 | 5 | time when -- because we have lockouts.  We have to |
| 02:54 | 6 | get there, go open the door, anywhere on the site |
| 02:54 | 7 | within five minutes.  He was saying I wasn't |
| 02:54 | 8 | getting to my assignments in five minutes. |
| 02:54 | 9 | Q.   So he's saying there's no new supervisor |
| 02:54 | 10 | in town, he was excited and bragging about his new |
| 02:54 | 11 | job, that was the basic gist of this conversation? |
| 02:54 | 12 | A.   He was chastising me.  He was directing |
| 02:54 | 13 | everything at me and it was not true. |
| 02:54 | 14 | Q.   What about this conversation did you -- |
| 02:54 | 15 | A.   He never -- |
| 02:54 | 16 | Q.   I know you have a lot to say.  But we each |
| 02:54 | 17 | need to have our turn and only speak one at a time. |
| 02:54 | 18 | A.   Okay. |
| 02:54 | 19 | Q.   What about this conversation with |
| 02:54 | 20 | Mr. Schmidt when he learned he was being promoted |
| 02:54 | 21 | out of the security -- I'm sorry, out of the |
| 02:54 | 22 | controller room and into quality assurance or |
| 02:54 | 23 | quality control, what about the conversation did |
| 02:54 | 24 | you find racially harassing? |
| 02:55 | 25 | A.   The whole conversation. |

JAMES SETTLE

Page 133

02:55   1       Q.   Did he use any derogatory remark, did he

02:55   2   use the N word or any other slur?

02:55   3       A.   He accused me of things that weren't true,

02:55   4   nobody else was complaining about but him.

02:55   5       Q.   But the things he was accusing you of

02:55   6   were --

02:55   7       A.   False.

02:55   8       Q.   -- well, you perceived them to be false

02:55   9   statements about your work performance, right?

02:55   10      A.   Yes.

02:55   11      Q.   But he wasn't saying anything derogatory

02:55   12  about your status as an African-American, right?

02:55   13      A.   He didn't even talk about the matter at

02:55   14  hand.  He called me to talk about the guy that was

02:55   15  trying to get in.  He ended the conversation with

02:55   16  me not doing my job and if I didn't do my job, I

02:56   17  was going to be fired.

02:56   18      Q.   Okay.

02:56   19      A.   That's how he ended it.  He never called

02:56   20  me about -- and he wasn't even in the position to

02:56   21  be talking to me like that, anyway.

02:56   22      Q.   But he never used any racial slurs?

02:56   23      A.   No.  There was more to cutting people down

02:56   24  than racial slurs.  He already used them to

02:56   25  somebody else.

38

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 134

| | | |
|---|---|---|
| 02:56 | 1 | Q.   But to you he never used any racial slurs |
| 02:56 | 2 | in the first conversation, right? |
| 02:56 | 3 | A.   No. |
| 02:56 | 4 | Q.   All it was, was a discussion about -- you |
| 02:56 | 5 | felt it was not his place to be disciplining you |
| 02:56 | 6 | and talking about your work performance? |
| 02:56 | 7 | A.   At that time, I didn't feel -- I thought |
| 02:56 | 8 | that me and him could work that out.  I thought |
| 02:56 | 9 | that I could win him over, because I knew that I |
| 02:56 | 10 | was doing -- I had the right intentions.  I thought |
| 02:56 | 11 | I could win him over. |
| 02:56 | 12 | At that particular time, I said okay.  I |
| 02:56 | 13 | said, well, maybe he misunderstood.  Maybe he got |
| 02:56 | 14 | me mixed up with somebody else or something, but I |
| 02:57 | 15 | don't know.  I thought we would work it out.  I |
| 02:57 | 16 | didn't say nothing but okay, and hung the phone up. |
| 02:57 | 17 | Q.   Okay.  After that first memorable |
| 02:57 | 18 | interaction, what was the next time you had a |
| 02:57 | 19 | personal encounter with Mr. Schmidt? |
| 02:57 | 20 | A.   That was after he got the position then. |
| 02:57 | 21 | Q.   And once he got the position, did he ever |
| 02:57 | 22 | use any racial slurs towards you? |
| 02:57 | 23 | A.   He came to me and he talked -- we didn't |
| 02:57 | 24 | have many conversations. |
| 02:57 | 25 | Q.   How many times do you think you met with |

39

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 135

| 02:57 | 1 | him? |
| 02:57 | 2 | A.    When I actually met him, it was sometime |
| 02:57 | 3 | after he got the position. |
| 02:57 | 4 | Q.    Okay. |
| 02:57 | 5 | A.    Someone called me on the radio -- |
| 02:57 | 6 | Q.    Let me just stop you. |
| 02:57 | 7 | So at the time he got the position, you |
| 02:57 | 8 | never met him in person, you just had in one radio |
| 02:57 | 9 | and then landline conversation, right? |
| 02:57 | 10 | A.    He wouldn't -- another thing, he quit |
| 02:57 | 11 | responding -- |
| 02:57 | 12 | Q.    Let me just focus you here.  I want to get |
| 02:57 | 13 | the meetings and understand the nature of and |
| 02:58 | 14 | timing of your interactions here before we get into |
| 02:58 | 15 | the substance. |
| 02:58 | 16 | We've talked about the first eight months, |
| 02:58 | 17 | you have no problems.  He's about to be promoted. |
| 02:58 | 18 | You have this memorable conversation, first over |
| 02:58 | 19 | the radio, and then it continues over the landline, |
| 02:58 | 20 | right?  And we talked about that conversation. |
| 02:58 | 21 | A.    Yes. |
| 02:58 | 22 | Q.    What's the next personal interaction that |
| 02:58 | 23 | you have with Mr. Schmidt, after he gets his |
| 02:58 | 24 | promotion, right? |
| 02:58 | 25 | A.    Yes. |

40

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 138

| | | |
|---|---|---|
| 03:01 | 1 | incident about me going to the wrong building. |
| 03:01 | 2 | I didn't even disagree with him, even |
| 03:01 | 3 | though I did.  I didn't want to be -- I wanted to |
| 03:01 | 4 | get -- I wanted to be there.  I liked where I was. |
| 03:01 | 5 | So I didn't deny or say anything.  I just told him, |
| 03:01 | 6 | I said, maybe things will get better.  But it |
| 03:01 | 7 | didn't, it got worse. |
| 03:01 | 8 | Q.   Let me understand, here.  During this |
| 03:01 | 9 | second interaction outside by the equipment with |
| 03:01 | 10 | Mr. Schmidt in person, he's talking to you about |
| 03:01 | 11 | the -- again, about you're going to the wrong site, |
| 03:01 | 12 | but there's no racially motivated jokes, no slurs, |
| 03:01 | 13 | correct? |
| 03:01 | 14 | A.   No. |
| 03:01 | 15 | Q.   Not using the N word? |
| 03:01 | 16 | A.   No, he didn't say anything. |
| 03:01 | 17 | Q.   It was all -- it was all -- you thought it |
| 03:01 | 18 | was a misunderstanding on his part relating to your |
| 03:01 | 19 | performance? |
| 03:01 | 20 | A.   I -- I thought -- what was going through |
| 03:02 | 21 | my mind is that I thought that if I did my job, he |
| 03:02 | 22 | would leave me alone.  That's the only thing -- I |
| 03:02 | 23 | knew that he was not correct.  I knew that he was |
| 03:02 | 24 | saying -- what he was trying to say is that I'm |
| 03:02 | 25 | going to get rid of you. |

41

JAMES SETTLE

Page 143

| | | |
|---|---|---|
| 03:07 | 1 | nodded his head, were you ever subjected to that |
| 03:07 | 2 | slur while working at The Wackenhut Corporation? |
| 03:08 | 3 | A.   Was I -- |
| 03:08 | 4 | Q.   Did you ever personally hear that slur |
| 03:08 | 5 | from Mr. Schmidt? |
| 03:08 | 6 | A.   No, I felt it. |
| 03:08 | 7 | Q.   You felt it? |
| 03:08 | 8 | A.   Yes, I did. |
| 03:08 | 9 | Q.   Okay.  How did you feel it? |
| 03:08 | 10 | A.   How did I feel it? |
| 03:08 | 11 | Q.   Yes.  What do you mean you felt it? |
| 03:08 | 12 | A.   The agony, the harassment, the |
| 03:08 | 13 | frustration.  It materialized itself.  Of course he |
| 03:08 | 14 | didn't -- |
| 03:08 | 15 | Q.   You think his conduct reflected his |
| 03:08 | 16 | sentiments even though you never heard that |
| 03:08 | 17 | statement, is that what you're saying? |
| 03:08 | 18 | A.   Yes, he wanted to be nice to me.  He |
| 03:08 | 19 | wanted me to think he was doing his job. |
| 03:08 | 20 | Q.   Mr. Schmidt wanted you to think he was |
| 03:08 | 21 | doing his job? |
| 03:08 | 22 | A.   Yes, he wanted me to think he was just |
| 03:08 | 23 | doing his job, but he was not.  He was tearing me |
| 03:08 | 24 | down behind my back. |
| 03:08 | 25 | Q.   And do you feel that Janice Woelffer ever |

42

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 144

| | | |
|---|---|---|
| 03:09 | 1 | harassed you on the basis of your race? |
| 03:09 | 2 | A.    Like I said, Ms. Woelffer probably |
| 03:09 | 3 | wouldn't be in this if she wasn't supporting him. |
| 03:09 | 4 | Q.    She was just doing her job, following |
| 03:09 | 5 | directions as part of her job, right? |
| 03:09 | 6 | A.    And she was liking it. |
| 03:09 | 7 | Q.    Why is that? |
| 03:09 | 8 | A.    If it wasn't for the incident at that J |
| 03:09 | 9 | gate, she probably wouldn't be named.  She came |
| 03:09 | 10 | down there to harass me for them and then she went |
| 03:09 | 11 | back and laughed about it like it was funny. |
| 03:09 | 12 | Q.    Well, the conversation she had with you at |
| 03:09 | 13 | J gate, she didn't make any racial slurs? |
| 03:09 | 14 | A.    No, but she humiliated me. |
| 03:09 | 15 | Q.    How did she humiliate you? |
| 03:09 | 16 | A.    She accused me of things that was not true |
| 03:09 | 17 | just to build a case to go back to give to Art |
| 03:09 | 18 | Talley, which Art Talley was trying to build a case |
| 03:10 | 19 | for Dale.  He had already put out in an e-mail to |
| 03:10 | 20 | write me up for -- |
| 03:10 | 21 | If you look at this, right after he made |
| 03:10 | 22 | that statement, I started getting all these |
| 03:10 | 23 | writeups -- I got wrote up for every supervisor |
| 03:10 | 24 | except Ron Deloach because he wouldn't do it.  And |
| 03:10 | 25 | he harassed Ron Deloach to do it.  He wouldn't do |

43

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 145

| | | |
|---|---|---|
| 03:10 | 1 | it. |
| 03:10 | 2 | How come my supervisor didn't write me up, |
| 03:10 | 3 | but all these other ones did that I didn't hardly |
| 03:10 | 4 | work with? |
| 03:11 | 5 | Q.  When was the first time you applied for a |
| 03:11 | 6 | promotion at TWC while you worked at the Chevron |
| 03:11 | 7 | Park site? |
| 03:11 | 8 | A.  The first time I applied for a promotion |
| 03:12 | 9 | was when I tried to become permanent.  I was not |
| 03:12 | 10 | permanent.  I stayed temporary for a long time. |
| 03:12 | 11 | And I was discriminated against then.  But I didn't |
| 03:12 | 12 | say nothing.  I wasn't racially discriminated |
| 03:12 | 13 | against, I was sexually discriminated against by |
| 03:12 | 14 | Bonnie. |
| 03:12 | 15 | Q.  But there was no difference in the terms |
| 03:12 | 16 | of your pay or benefits in your classification as a |
| 03:12 | 17 | TWC employee, right? |
| 03:12 | 18 | A.  What did you say, now? |
| 03:12 | 19 | Q.  There's no difference in terms of your pay |
| 03:12 | 20 | in benefits from being temporarily assigned to |
| 03:12 | 21 | Chevron Park and being permanently assigned, right? |
| 03:12 | 22 | A.  It was difference in hours.  When you're |
| 03:12 | 23 | temporary -- |
| 03:12 | 24 | Q.  Uh-huh. |
| 03:12 | 25 | A.  -- you didn't get the hours.  I was still |

44

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 146

03:13    1    making $10.25, but I wouldn't work 40 hours.

03:13    2    Sometimes I would work more than 40 hours because

03:13    3    they needed to help.  It was inconsistent.  It was

03:13    4    up and down.

03:13    5            If I was permanent, I would get a

03:13    6    permanent post, I would work 40 hours, and then I

03:13    7    would be able to work the overtime as well.

03:13    8    Because they have it all the time.  So I would

03:13    9    automatically be into overtime, because I'm already

03:13   10    working 40 hours.

03:13   11        Q.    How long after you were assigned to the

03:13   12    Chevron Park site did you -- did you start working

03:13   13    40 hours a week?

03:13   14        A.    I got my 40 hours -- I got permanent after

03:14   15    they beat me out of that sergeant position.  And

03:14   16    Dale had something to do with that.  And he wasn't

03:14   17    even considered as his promotion yet.

03:14   18        Q.    Okay.  So at the time that you started

03:14   19    working at the Chevron Park site, what was your job

03:14   20    title?

03:14   21        A.    I was a rover/receptionist.

03:14   22        Q.    And when was the first time you applied to

03:14   23    have a different job title?

03:14   24        A.    The first time I applied for a different

03:14   25    job title was I was trying to be a full-time

45

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 147

03:14    1    receptionist.

03:14    2        Q.    And when did you apply to be a full-time

03:14    3    receptionist?

03:14    4        A.    I do not remember the date.  I think it

03:14    5    was -- it was maybe two to three months later.

03:15    6    Maybe two months later.

03:15    7        Q.    Two to three months after being assigned

03:15    8    to the Chevron Park site?

03:15    9        A.    Yes.

03:15   10        Q.    And would a full-time receptionist have

03:15   11    earned more money?

03:15   12        A.    Yes.

03:15   13        Q.    What would be the difference in salary?

03:15   14        A.    First, I would have gotten 40 hours.  I

03:15   15    would have worked -- well, it was Monday through

03:15   16    Friday.  I think the receptionist maybe paid $1

03:15   17    more, because I would have been a full-time

03:15   18    receptionist Monday through Friday.

03:15   19        Q.    So as a rover/receptionist, how many hours

03:15   20    a week were you working those first two to three

03:15   21    months?

03:15   22        A.    How many hours was I working?

03:15   23        Q.    Yes.

03:15   24        A.    Like I said, it varied.

03:16   25        Q.    Give me your best estimate?

46

JAMES SETTLE

Page 148

03:16  1    A.    Sometimes I would get 96 hours in two

03:16  2    weeks.  Sometimes I would get 76 hours, 64 hours.

03:16  3    Q.    So to whom did you apply to be a full-time

03:16  4    receptionist?

03:16  5    A.    Let me back up a little bit on my

03:16  6    position, because I was picked over.  Ife came in

03:16  7    and I thought I was going to get the job

03:16  8    automatically because I didn't have a full-time

03:17  9    position.  And she gave that job to Ife.

03:17  10    Q.    And Ife is African-American, right?

03:17  11    A.    Yes.  And I went back to -- to -- I was

03:17  12    wondering why I didn't get the full-time position,

03:17  13    because I told the supervisor -- I told Richard

03:17  14    Knott that -- which is another supervisor, that I

03:17  15    wanted full-time.  And at that particular time,

03:17  16    there was no lates.  There was nothing on my

03:17  17    record.  I was doing everything I was told to do.

03:17  18            And I thought I was going to get that

03:17  19    position, and -- but it was given to Ife.  So I

03:17  20    went and asked about it.

03:17  21    Q.    And did you feel you were more qualified

03:17  22    than Ife?

03:17  23    A.    No, it wasn't a thing -- I thought that I

03:17  24    had been on the job long enough to -- I had

03:18  25    seniority.  Ife was fresh -- fresh right off the

47

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 149

03:18   1    street.

03:18   2        Q.   But it wasn't based on race, they just had

03:18   3    some other criteria for wanting Ife?

03:18   4        A.   No, it was because she was a woman.   And

03:18   5    that's the way Bonnie operates.   If a woman comes

03:18   6    in and wants a job, she gets it right away.   And

03:18   7    Ife was -- was -- she -- I didn't think she would

03:18   8    get the job because she would relieve me late all

03:18   9    the time.

03:18   10       Q.   So Ife wasn't as good as an employee as

03:18   11   you were and that's why you thought you deserved

03:18   12   the job?

03:18   13       A.   No, I didn't think that.   I wasn't

03:18   14   thinking that at all, because she was late all the

03:18   15   time.   But if I'm coming to work on time and I'm

03:19   16   doing my job and I'm -- and I wasn't even looking

03:19   17   at it from that standpoint.   I was looking at the

03:19   18   standpoint that I needed a position.

03:19   19          I worked at Concord in that same

03:19   20   receptionist capacity for almost a year -- it was a

03:19   21   year, and I thought that I had already told

03:19   22   management that I wanted a permanent position, and

03:19   23   they said it was okay, it was fine.   And they led

03:19   24   me to believe I was going to get the position.

03:19   25          But when the job was given to Ife, I went

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 152

```
03:22   1      A.   It was on the swing shift.

03:22   2      Q.   Okay.  And you initiated the conversation?

03:22   3      A.   I initiated the meeting.

03:22   4      Q.   You initiated the meeting.  And the

03:22   5    purpose of the meeting was to discuss your wanting

03:22   6    to apply for the sergeant's position, right?

03:22   7      A.   No.

03:22   8      Q.   What was it for?

03:22   9      A.   It was for more hours, a raise, something.

03:22  10      Q.   It was a discussion that you initiated

03:22  11    with Bonnie that you wanted to find more hours,

03:22  12    more money?

03:22  13      A.   That particular time I still was not

03:22  14    permanent.  It was about some type of proposal.

03:23  15    She brought up the sergeant position.

03:23  16      Q.   So she invited you to apply for the

03:23  17    sergeant position?

03:23  18      A.   Yes, she did.

03:23  19      Q.   Okay.  Did you fill out an application or

03:23  20    how did you go about applying?

03:23  21      A.   She told me -- she asked me what my

03:23  22    credentials were.  I told her I would bring

03:23  23    tomorrow a resume and some of my certificates.  I

03:23  24    brought all that in the next day.  She was

03:23  25    impressed with it.  She said:  I didn't even know
```

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 153

03:23   1    this.

03:23   2        Q.   So was there actually an open sergeant's

03:23   3    position or you were just discussing the

03:23   4    possibility at this time?

03:23   5        A.   No, she brought it up that Garrison, one

03:23   6    of the other sergeants, didn't want the position

03:23   7    anymore, he was stepping down.  She didn't tell me

03:23   8    who it was at the time.  She said:  One of my

03:23   9    sergeants is stepping down and I'm going to have an

03:23  10    open position.

03:23  11        Q.   Okay.  So the next day you bring in your

03:23  12    certificates.  When did you hear that you were not

03:24  13    hired for the sergeant's position?

03:24  14        A.   I didn't hear that I didn't have the

03:24  15    position until after the person got the position.

03:24  16        Q.   So who was it who got the position?

03:24  17        A.   Ron Deloach got the position.

03:24  18        Q.   And Mr. Deloach is African-American?

03:24  19        A.   Yes.

03:24  20        Q.   So Bonnie's decision to hire Mr. Deloach

03:24  21    wasn't primarily --

03:24  22        A.   Bonnie was wanting to hire me.  Bonnie

03:24  23    didn't hire me because Dale told her -- made those

03:24  24    derogatory comments about my speech, that I was

03:24  25    dumb, ignorant, and I would make her look bad.

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 154

| | | |
|---|---|---|
| 03:24 | 1 | Q.   Okay. |
| 03:24 | 2 | A.   This came from somebody who heard him say |
| 03:24 | 3 | this, because she repeated what he said. |
| 03:24 | 4 | Q.   So I understand this, though.  You're not |
| 03:24 | 5 | contending that you did not receive the sergeant's |
| 03:24 | 6 | position that Mr. Deloach received because you were |
| 03:25 | 7 | African American, inasmuch as Mr. Deloach is also |
| 03:25 | 8 | African-American, right? |
| 03:25 | 9 | A.   Right. |
| 03:25 | 10 | Q.   So it wasn't race discrimination on the |
| 03:25 | 11 | part of Ms. Sutterfield and The Wackenhut |
| 03:25 | 12 | Corporation in hiring Mr. Deloach instead of you, |
| 03:25 | 13 | right? |
| 03:25 | 14 | A.   I can't say right, because there's more |
| 03:25 | 15 | variables than this.  You're not understanding |
| 03:25 | 16 | what's going on. |
| 03:25 | 17 | Q.   It's a very narrow question, sir.  Do you |
| 03:25 | 18 | believe that Bonnie Sutterfield and The Wackenhut |
| 03:25 | 19 | Corporation were motivated by the fact that you |
| 03:25 | 20 | were African-American in promoting Mr. Deloach |
| 03:25 | 21 | instead of you to the sergeant's position in 2005, |
| 03:25 | 22 | yes or no? |
| 03:25 | 23 | A.   The -- |
| 03:25 | 24 | Q.   Do you want the question read back? |
| 03:25 | 25 | A.   I have to say no. |

51

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 159

| | | |
|---|---|---|
| 03:31 | 1 | you applied for? |
| 03:31 | 2 | A.    Control room operator. |
| 03:31 | 3 | Q.    When did you apply to be a control room |
| 03:31 | 4 | operator? |
| 03:31 | 5 | A.    It was around March. |
| 03:31 | 6 | Q.    March 2005? |
| 03:31 | 7 | A.    Yes. |
| 03:31 | 8 | Q.    How did you learn about the control |
| 03:31 | 9 | operator position? |
| 03:31 | 10 | A.    I was a receptionist, so Dale had put out |
| 03:31 | 11 | an e-mail that he was looking for a control room |
| 03:32 | 12 | operator.  And so I jumped on it right away, and I |
| 03:32 | 13 | put in -- I wrote a consideration letter. |
| 03:32 | 14 | Q.    And who did you write the consideration |
| 03:32 | 15 | letter to? |
| 03:32 | 16 | A.    I put it in Dale's box.  And I put a |
| 03:32 | 17 | resume in Dale's box.  But he never responded to |
| 03:32 | 18 | me.  So I went to Bonnie. |
| 03:32 | 19 | Q.    So you learn about the control room |
| 03:32 | 20 | operator position from an e-mail from Dale Schmidt. |
| 03:32 | 21 | And who receives this e-mail? |
| 03:32 | 22 | A.    Everybody that had access to a computer. |
| 03:32 | 23 | Q.    How soon after you received the e-mail |
| 03:32 | 24 | from Dale Schmidt about the control room operator |
| 03:32 | 25 | position did you put the letter in his box, the |

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

03:39  1      Q.    It may not have been the most compelling

03:39  2   reason, but she wasn't motivated by your being

03:39  3   African-American?

03:39  4      A.    No, she doesn't -- I don't think Bonnie

03:39  5   was color-racist, but she was sexist for sure.

03:39  6      Q.    But she ultimately hired another man?

03:39  7      A.    She hired him because she wanted to

03:39  8   satisfy Veronica.

03:39  9      Q.    Which may not have been the most

03:39  10   compelling reason, but it wasn't necessarily

03:39  11   illegal, right?

03:39  12      A.    And right after I talked to her, I was

03:40  13   interviewed the next day.

03:40  14      Q.    All right.  Let's just focus on the

03:40  15   question at hand.  All right?

03:40  16           Offering the job to Mr. Ruiz -- your

03:40  17   contention is Bonnie Sutterfield offered the job to

03:40  18   Mr. Ruiz as a wedding present to Veronica, yes?

03:40  19      A.    Yes.

03:40  20      Q.    Did Ms. Woelffer had any role in the

03:40  21   selection and hiring of the control room operator?

03:40  22      A.    No -- are you talking about Ms. Woelffer,

03:40  23   no, she had nothing do with it.

03:40  24      Q.    She wasn't involved in that promotion

03:40  25   situation?

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 167

| | | |
|---|---|---|
| 03:40 | 1 | A.    No, she wasn't involved in that promotion. |
| 03:40 | 2 | Q.    Okay.   In fact, the only involvement by |
| 03:40 | 3 | Ms. Woelffer that forms the basis of any facts in |
| 03:40 | 4 | your lawsuit is her interaction with you at Gate J? |
| 03:40 | 5 | A.    Yes. |
| 03:40 | 6 | Q.    And that was that one night? |
| 03:40 | 7 | A.    Yes. |
| 03:40 | 8 | Q.    Other than that, Ms. Woelffer had no role |
| 03:41 | 9 | in doing any activities that formed the basis of |
| 03:41 | 10 | your lawsuit? |
| 03:41 | 11 | A.    Well, other than -- other than she was -- |
| 03:41 | 12 | Q.    She performed -- |
| 03:41 | 13 | A.    She was trying to coerce Ron Deloach into |
| 03:41 | 14 | a writeup on me. |
| 03:41 | 15 | Q.    In other words, in addition to the |
| 03:41 | 16 | incident at Gate J that evening, Ms. Woelffer was |
| 03:41 | 17 | also encouraging Mr. Deloach to discipline you? |
| 03:41 | 18 | A.    Yes, discipline me when he didn't want to |
| 03:41 | 19 | do it, when he was telling her -- |
| 03:41 | 20 | Q.    That's her only involvement in this |
| 03:41 | 21 | lawsuit? |
| 03:41 | 22 | A.    -- he wasn't going to do it.  They were |
| 03:41 | 23 | constantly forcing him to do it. |
| 03:41 | 24 | Q.    That's her only involvement, that's why |
| 03:41 | 25 | you sued her? |

54

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 168

03:41   1       A.   Yes.

03:41   2       Q.   No other reason?

03:41   3       A.   She had no right to do that.

03:41   4       Q.   Wasn't it her job, wasn't she following

03:42   5   what she believed was her responsibilities?

03:42   6       A.   I think she was going a little bit beyond

03:42   7   her responsibility.

03:42   8           MR. WAGNER:   Let's go off the record for

03:42   9   just a minute.

03:42  10           (Recess taken.)

03:47  11   BY MR. WAGNER:

03:47  12       Q.   Let's talk about the process for your

03:47  13   applying for the control room operator position?

03:47  14       A.   Yes.

03:47  15       Q.   What tests were you required to take as

03:47  16   part of your application?

03:47  17       A.   You know what, I don't know as far as

03:47  18   being a verbal test, the name of the test, I don't

03:47  19   know what that was.

03:47  20       Q.   I don't need the formal name.  Describe

03:47  21   for me the type of test that they had you take.  It

03:48  22   was a typing test, right?

03:48  23       A.   Yes.

03:48  24       Q.   Okay.  So the typing test, how did you do?

03:48  25       A.   He said -- they were asking for 25 words

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 169

| | | |
|---|---|---|
| 03:48 | 1 | and I was -- I didn't know I was going to take a |
| 03:48 | 2 | test.  I don't think he knew he was going to give |
| 03:48 | 3 | me one. |
| 03:48 | 4 | Q.  Do you have any reason to believe -- who |
| 03:48 | 5 | was it who told you, you typed 25 words per minute? |
| 03:48 | 6 | A.  The memo said that you needed to type |
| 03:48 | 7 | 25 words per minute.  I type 27 words per minute. |
| 03:48 | 8 | Q.  Let's back up.  I'm not understanding. |
| 03:48 | 9 | Who is it that's administering these tests? |
| 03:48 | 10 | A.  It was Dale. |
| 03:48 | 11 | Q.  Dale Schmidt.  Okay.  Where is this taking |
| 03:48 | 12 | place? |
| 03:48 | 13 | A.  In a control room. |
| 03:48 | 14 | Q.  What time of day?  On the swing shift? |
| 03:48 | 15 | A.  It was when I very first came to work.  It |
| 03:49 | 16 | was a couple of days -- either the next day or the |
| 03:49 | 17 | day after I talked to Bonnie.  As soon as I got the |
| 03:49 | 18 | word they said I needed to go see Dale.  I went to |
| 03:49 | 19 | see Dale we talked about -- he tried to discourage |
| 03:49 | 20 | me to take the position. |
| 03:49 | 21 | I thought he was going to give me the |
| 03:49 | 22 | position or was going to at least consider me.  But |
| 03:49 | 23 | he started telling me about the position at first. |
| 03:49 | 24 | Q.  Okay.  Let me -- |
| 03:49 | 25 | A.  Let me answer your question. |

56

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 170

| | | |
|---|---|---|
| 03:49 | 1 | Q.   Let me interject here, sir.  This is the |
| 03:49 | 2 | day following your conversation with Bonnie |
| 03:49 | 3 | Sutterfield about the position, and she said that |
| 03:49 | 4 | it's Dale's gig and the next day you go in and talk |
| 03:49 | 5 | to Dale? |
| 03:49 | 6 | A.   It was immediately.  I remember it was |
| 03:49 | 7 | immediately.  It might have been the next day or |
| 03:49 | 8 | the day after, but it was short.  It was right |
| 03:49 | 9 | after -- shortly after we spoke. |
| 03:50 | 10 | Q.   Shortly after you and Bonnie spoke? |
| 03:50 | 11 | A.   Yes. |
| 03:50 | 12 | Q.   You're in the control room? |
| 03:50 | 13 | A.   Yes. |
| 03:50 | 14 | Q.   And you thought that at that point Dale |
| 03:50 | 15 | was going to offer you the job? |
| 03:50 | 16 | A.   Well, I thought he was going to be fair |
| 03:50 | 17 | and consider me, you know.  He was very nice. |
| 03:50 | 18 | Q.   Uh-huh.  So he was very nice to you.  And |
| 03:50 | 19 | at what point did he say you had to take some |
| 03:50 | 20 | tests? |
| 03:50 | 21 | A.   At the point he couldn't convince me to |
| 03:50 | 22 | back down.  He was telling me the negative parts of |
| 03:50 | 23 | the job, and that I was going to be drilled by |
| 03:50 | 24 | three managers, and I was going to have to be able |
| 03:50 | 25 | to respond to each one and be able to do the work. |

JAMES SETTLE

57

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 171

03:50    1            And I told him that I was willing to do

03:50    2    that.

03:50    3        Q.    So he describes all of the requirements of

03:50    4    the position and you tell him you're willing to

03:50    5    perform them, right?

03:50    6        A.    Yes.

03:50    7        Q.    Okay.  And then he said you needed to take

03:51    8    some tests?

03:51    9        A.    And then he said -- I don't know if he

03:51    10   actually said he was going to give me the tests.  I

03:51    11   think he told me:  All right -- I think he

03:51    12   exhausted himself that I wasn't going to back down.

03:51    13   And I he said:  All right -- I remember him

03:51    14   saying -- he told me:  Sit right here.

03:51    15       And he grabbed a sheet of paper -- he put

03:51    16   a document with words on it.  He said -- he opened

03:51    17   up Word and he said:  Type this.  And he said -- he

03:51    18   said:  Hold on -- because I was going.  And he

03:51    19   said:  Go ahead.

03:51    20       And then he was timing me from his watch.

03:51    21       Q.    And you're pointing to your watch as

03:52    22   you're speaking, right?

03:52    23       A.    Yes, he pointed to his watch.

03:52    24       Q.    Okay.

03:52    25       A.    He told me to hold on, and then he said:

JAMES SETTLE

Page 172

03:52   1    Go ahead.

03:52   2         Q.   So he is timing you --

03:52   3         A.   While I type.

03:52   4         Q.   While you type.  And how long was the

03:52   5    test, did he give you one minute, two minutes?

03:52   6         A.   He gave me a minute.  And then he said:

03:52   7    Time is up.  He took the sheet of paper and counted

03:52   8    the words and he said I typed 27 words per minute.

03:52   9         Q.   Okay.  And did you look at the test

03:52   10   yourself and did you have a different opinion?

03:52   11        A.   No.  I didn't have -- he said 27.  All you

03:52   12   needed was 25.  And I can type more than 27.  I

03:52   13   didn't know I was going to take a typing test.  I

03:52   14   was nervous.  That's why I was fumbling through the

03:52   15   words.

03:52   16        Q.   Where did you come up with the idea that

03:52   17   the position only requires 25 words per minute?

03:52   18        A.   That was on the e-mail.

03:53   19        Q.   What's the job of a control room operator,

03:53   20   what are the duties?

03:53   21        A.   It's almost just like the duties of a

03:53   22   receptionist.  You do just a little bit more.  You

03:53   23   dispatch more, speak to three audiences.  You speak

03:53   24   to maintenance and you speak to security and you

03:53   25   speak to the executives.

59

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 174

03:55  1    desk in proximity to the control room?

03:55  2        A.   It's --

03:55  3        Q.   Are they in the same room, are they

03:55  4    adjacent?

03:55  5        A.   No.  The receptionist's desk is up front.

03:55  6    That's in the front lobby.  And the control room

03:55  7    is, like, in the middle of that same building.

03:55  8    Sort of like across the hall.

03:55  9        Q.   Okay.  So you have a meeting with Dale, he

03:55  10   describes the rigors of the position, he gives you

03:55  11   the typing test.  What happens next?  Does he give

03:55  12   you any other test?

03:55  13       A.   Yes.  After the typing test, he went into

03:55  14   Excel.

03:55  15       Q.   Uh-huh.

03:55  16       A.   And he asked me to perform some functions,

03:55  17   performed those functions.  And he had me create

03:55  18   some worksheet.  I created it, but as I was taking

03:56  19   the test, if -- if I did it right, it was always --

03:56  20   that ain't the way I wanted it done.  There's more

03:56  21   than one way to operate Excel.  He'll say:  It took

03:56  22   too long.

03:56  23       Q.   And how long was the Excel test?

03:56  24       A.   How long was the test?

03:56  25       Q.   Yes, how long did you work on Excel with

60

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 175

| | | |
|---|---|---|
| 03:56 | 1 | Mr. Schmidt as part of the interview? |
| 03:56 | 2 | A.    The whole thing was an hour, 45 minutes to |
| 03:56 | 3 | an hour. |
| 03:56 | 4 | Q.    The whole interview, including all the |
| 03:56 | 5 | testing? |
| 03:56 | 6 | A.    Yes, because he was fishing -- |
| 03:56 | 7 | Q.    Sir, let's just focus on the question. |
| 03:56 | 8 | The whole interview, including the testing, was |
| 03:56 | 9 | about 45 minutes to an hour, right? |
| 03:56 | 10 | A.    Yes. |
| 03:56 | 11 | Q.    Okay.  And how long was the discussion |
| 03:56 | 12 | before you started the typing test? |
| 03:56 | 13 | A.    The discussion? |
| 03:56 | 14 | Q.    Uh-huh, your interview process. |
| 03:56 | 15 | A.    We talked for about 20 minutes. |
| 03:57 | 16 | Q.    The whole interview was about 45 minutes |
| 03:57 | 17 | to an hour, the first 20 minutes are talking, |
| 03:57 | 18 | right? |
| 03:57 | 19 | A.    Right. |
| 03:57 | 20 | Q.    And then you take the typing test, right? |
| 03:57 | 21 | A.    Yes. |
| 03:57 | 22 | Q.    And how long does the typing test take to |
| 03:57 | 23 | administer from start to finish, a couple of |
| 03:57 | 24 | minutes? |
| 03:57 | 25 | A.    A minute. |

61

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 177

| | | |
|---|---|---|
| 03:58 | 1 | A.    Maybe 10, 15 minutes. |
| 03:58 | 2 | Q.    Okay.  And were there any other tests or |
| 03:58 | 3 | screening tools that Mr. Schmidt used during the |
| 03:58 | 4 | interview for the control room operator position? |
| 03:58 | 5 | A.    I know we did something in Word.  I know |
| 03:58 | 6 | he wanted to see how I could save different things. |
| 03:58 | 7 | Q.    Have you also performed some functions in |
| 03:58 | 8 | Microsoft Word? |
| 03:58 | 9 | A.    Saving.  It was more about saving. |
| 03:59 | 10 | Q.    Document saving and management in Word? |
| 03:59 | 11 | A.    Yes, and putting it in files. |
| 03:59 | 12 | Q.    Okay.  And how long did that process take, |
| 03:59 | 13 | the -- your showing your level of proficiency with |
| 03:59 | 14 | Microsoft Word? |
| 03:59 | 15 | A.    That was probably another 10 minutes, you |
| 03:59 | 16 | know. |
| 03:59 | 17 | Q.    Okay.  Any other tests as part of the |
| 03:59 | 18 | interview? |
| 03:59 | 19 | A.    Now, then he did a -- then he did a -- he |
| 03:59 | 20 | did an Outlook-type test with saving e-mail and |
| 03:59 | 21 | grouping it together and sending it out. |
| 03:59 | 22 | Q.    Anything else, any other tests after that? |
| 04:00 | 23 | A.    No, that was it. |
| 04:00 | 24 | Q.    How long after the interview with |
| 04:00 | 25 | Mr. Schmidt took place did you learn that you were |

62

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 181

| | | |
|---|---|---|
| 04:04 | 1 | working at Chevron. |
| 04:04 | 2 | Q.   You never told a doctor that? |
| 04:04 | 3 | A.   I never told her that.  I saw her maybe |
| 04:04 | 4 | three times.  I wasn't just her.  She asked me, did |
| 04:04 | 5 | I need a doctor.  I had already two doctors before |
| 04:05 | 6 | for the same problem.  The last time I was seeing |
| 04:05 | 7 | her, she asked me did I need a doctor then, and she |
| 04:05 | 8 | prescribed some pills. |
| 04:05 | 9 | Q.   And what pills did Dr. Lin prescribe? |
| 04:05 | 10 | A.   I don't know the name of them. |
| 04:05 | 11 | Q.   Are you still on any medication for your |
| 04:05 | 12 | heart? |
| 04:05 | 13 | A.   It's -- it was -- it wasn't my heart.  I |
| 04:05 | 14 | suffered with real bad heartburn at that time. |
| 04:05 | 15 | Q.   Okay.  So your chest pain was not |
| 04:05 | 16 | coronary-related? |
| | 17 | A.   No. |
| 04:05 | 18 | Q.   It was heartburn? |
| 04:05 | 19 | A.   Yes. |
| 04:05 | 20 | Q.   So did she prescribe some pills to treat |
| 04:05 | 21 | your heartburn? |
| 04:05 | 22 | A.   Yes. |
| 04:05 | 23 | Q.   Okay.  And how long did you take those? |
| 04:05 | 24 | A.   They didn't -- and I took them for a long |
| 04:06 | 25 | time, but they weren't working. |

63

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

| 04:07 | 1 | Q. Have you ever seen a psychiatrist? |
| 04:07 | 2 | A. Well, I did, yes. I did. |
| 04:07 | 3 | Q. When did you see a psychiatrist? |
| 04:07 | 4 | A. She thought -- |
| 04:07 | 5 | Q. She being Dr. Lin? |
| 04:07 | 6 | A. Yes, that there may have been some type of |
| 04:07 | 7 | depression or something. And she had me go see |
| 04:07 | 8 | some type of therapist or something. |
| 04:07 | 9 | Q. What was the name of the therapist? |
| 04:07 | 10 | A. I can't remember her name. |
| 04:07 | 11 | Q. How many times did you see her? |
| 04:07 | 12 | A. I only saw her once, and then she referred |
| 04:07 | 13 | some other sessions to me, but I had to work and I |
| 04:08 | 14 | never could go. And I just didn't go no more. |
| 04:08 | 15 | Q. And why did Dr. Lin believe you suffered |
| 04:08 | 16 | from depression? |
| 04:08 | 17 | A. She -- I don't know what she -- I don't |
| 04:08 | 18 | know where she got that from. |
| 04:08 | 19 | Q. Do you believe you suffer from depression? |
| 04:08 | 20 | A. I don't recall exactly -- I don't |
| 04:08 | 21 | recall -- do I believe I suffer from depression? |
| 04:08 | 22 | Q. Yeah, were you suffering from depression? |
| 04:08 | 23 | A. I was suffering from something. |
| 04:08 | 24 | Q. But you don't know whether it was |
| 04:08 | 25 | depression? |

64

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 202

1        DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA      }
                              }    ss.
3    COUNTY OF SAN FRANCISCO}

4        I, James Beasley, hereby certify:

5        I am a duly qualified Certified Shorthand

6    Reporter in the State of California, holder of

7    Certificate Number CSR 12807 issued by the Court

8    Reporters Board of California and which is in full

9    force and effect.  (Fed. R. Civ. P. 28(a)).

10       I am authorized to administer oaths or

11   affirmations pursuant to California Code of Civil

12   Procedure, Section 2093(b) and prior to being

13   examined, the witness was first duly sworn by me.

14   (Fed. R. Civ.  P. 28(a), 30(f)(1)).

15       I am not a relative or employee or

16   attorney or counsel of any of the parties, nor am I

17   a relative or employee of such attorney or counsel,

18   nor am I financially interested in this action.

19   (Fed. R. Civ. P. 28).

20       I am the deposition officer that

21   stenographically recorded the testimony in the

22   foregoing deposition and the foregoing transcript

23   is a true record of the testimony given by the

24   witness.  (Fed. R. Civ. P. 30 (f)(1)).

25       Before completion of the deposition,

JAMES SETTLE

65

e494fab2-63ac-48ce-84a6-cdf98ec53d77

Page 203

1    review of the transcript [  ] was [  ] was not

2    requested.  If requested, any changes made by the

3    deponent (and provided to the reporter) during the

4    period allowed, are appended hereto.  (Fed. R. Civ.

5    P. 30(e)).

6

7    Dated: _____, 2008

8

9                          _____

10                         JAMES BEASLEY, CSR No. 12807

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                                66

JAMES SETTLE

e494fab2-63ac-48ce-84a6-cdf98ec53d77

# Exhibit B

G 1190047.
4/30/04

# WACKENHUT

## APPLICATION FOR EMPLOYMENT

Wackenhut is an Equal Opportunity/Affirmative Action Employer. Applicants are considered for all positions without regard to race, color, religion, sex, national origin, age, or marital or veteran status, or the presence of a medical condition or disability.

**NAME AND ADDRESS**

1. Social Security Number: 4 1 2 - 2 9 - 3 9 5 8

2. Application Date: 0 4 - 0 7 - 0 3

3. Last Name: Sette | First: James | MI: L

4. Address: 3955 Vineyard

City: Pleasanton | State: CA | Zip Code: 94566 -

5. Home Phone: (925) 846-0725

6. Other Phone: (510) 589-6593

**POSITION DESIRED**

7. Position Applied For: Security Officer

8. (✓) Full Time    ( ) Part Time - If Part Time, Hours Available _____

   Salary Expected: $10    Date Available: upon request

9. Wackenhut must provide 24 hour-a-day service to its customers. Are you available to work whatever schedule is necessary to help us meet our Corporate objectives and our obligations to our customers? Yes ( ) No (✓)

   If no, what shifts or days are you available? 11pm - 6am

**PERSONAL INFORMATION**

10. Are you presently employed? Yes    If yes, may we contact your present employer? Yes

11. Do you have transportation? Yes

12. Have you ever been employed by Wackenhut? NO    If yes, where? _____

    When? _____    Position: _____

    Reason for leaving _____

13. Referral Source:    (✓) Newspaper Advertisement    ( ) Job Service
                        ( ) Employee Referral    ( ) Other _____

14. Names and relationships of relatives or acquaintances employed at Wackenhut: NONE

15. Have you ever been convicted for the violation of any law in a military or criminal court which has not been sealed, annulled or deleted from the record?   Yes ( ) No (✓)

    If yes, where? _____    When? _____

    Type of conviction? _____

16. Are you prevented from lawfully becoming employed in this country because of Visa or Immigration Status?
    Yes ( ) No (✓)

**THE FOLLOWING INFORMATION WILL ONLY BE CONSIDERED IF IT IS RELEVANT TO THE POSITION FOR WHICH YOU ARE APPLYING OR COULD BEAR UPON STATE LICENSING REQUIREMENTS.**

17. Are you currently engaged in using illegal drugs? NO    If yes, to what extent? _____

TWC 0061

**EDUCATION**

THE FOLLOWING INFORMATION WILL BE USED ONLY TO THE EXTENT THAT IS RELEVANT TO THE QUALIFICATIONS AND POSITION FOR WHICH YOU APPLY.

18. Circle highest grade completed:

1  2  3  4  5  6  7  8  9  10  11  (12)  13  14  15  16 _____

19. Do you have a high school diploma or GED?   Yes (✓)   No ( )

20. Did you graduate from College?   Yes ( )   No (✓)

If yes, Name of College? _____ Degree _____

**WORK HISTORY**

21. List all employment, including military, for the past seven (7) years beginning with your present job or last job held. If you need additional space, continue on a plain sheet of paper and attach it to the application.

From 2000
To Present

Employer Hilton Pleasanton   Supervisor John (Maint)
Address 7050 Johnson Dr
Tel. 925.463.8000   Salary 10.5 per hr
Position/Job Duties Security
Reason for leaving N/A

From 02/2000
To 10/2001

Employer AcFact   Supervisor Sandra
Address 555 Meridian
Tel. ————   Salary 11.5 per hr
Position/Job Duties Security
Reason for leaving Forced out

From 3/98
To 2/2000

Employer Pinkerton   Supervisor
Address 1101 Winchester
Tel. 408.248.1101   Salary _____ per _____
Position/Job Duties Security
Reason for leaving Contract Ended

From 3/96
To 12/97

Employer CDA   Supervisor Daryl Oates
Address 203 Beale Ste 305
Tel. 901.526.5313   Salary 8 per hr
Position/Job Duties Security
Reason for leaving Moved to Cal

From 11/91
To 3/96

Employer Maximum   Supervisor Johnson
Address 1254 Lamar AVE
Tel. 901.725.4322   Salary 8 per hr
Position/Job Duties Security
Reason for leaving Contract moved

68

TWC 0062

**WORK HISTORY**

22. Have you been dismissed, or asked to resign from employment? _yes_ Date _____

Employer _Ac Fac t_ _____ Reason _resigned_ _____

23. Have you ever been granted a military or government security clearance? Yes ( ) No (x)

If yes, level of clearance _____

24. Do you have any special job skills or qualifications that may be relevant to the position for which you are applying? If so, describe _See resume_ _____

_____

**REFERENCES**

25. Names of five persons who are not related to you and who are not former employers:

| Name and Occupation | Address | Phone Number |
|---|---|---|
| Christy Ehlers | | 925.443.8958 |
| Louis Lanza | | 925.833.9700 |
| Floyd Scruggs | 37. E. Lowell | 510.278.3888 |
| Elizabeth Blackman | 2865 Market | 510.655.1216 |
| Valerie Mance | 505 14th SF | 510.839.5100 |

### UNDERSTANDINGS AND AGREEMENTS

I understand that any misrepresentation, falsification or omission of this application shall be sufficient reason for refusal or dismissal of my employment. I hereby authorize investigation of all matters contained in this application and agree that if the results of such investigation are not satisfactory, any offer of employment made by The Wackenhut Corporation or any subsidiary hereinafter referred to as Wackenhut may be withdrawn, or my employment with Wackenhut may be terminated immediately. I agree to conform and adhere to the rules and regulations of Wackenhut. Further, I understand and agree that this application and any other materials I may receive are not intended to be, nor shall be construed to be a contract of employment, and that my employment and compensation may terminate, with or without cause, and with or without notice, at any time, at the option of either Wackenhut or myself.

In consideration of any offer of employment by Wackenhut, I hereby acknowledge, understand and agree that the following will constitute terms and conditions of any such employment:

(1) any losses or expenses incurred by Wackenhut, its clientele, or other third parties as a result of my unauthorized actions shall be immediately reimbursed to Wackenhut on terms that are satisfactory and acceptable to Wackenhut. To the extent permitted by law, I agree and hereby authorize Wackenhut to reduce my wages for any sums owing by me hereunder; and

(2) in recognition of the fact that any work related injuries which might be sustained by me are covered by state Workers' Compensation statutes, and to avoid the circumvention of such state statutes which may result from suits against the customers or clients of Wackenhut based on the same injury or injuries, and to the extent permitted by law, I HEREBY WAIVE AND FOREVER RELEASE ANY RIGHTS I MIGHT HAVE to make claims or bring suit against any client or customer of Wackenhut for damages based upon injuries which are covered under such Workers' Compensation statutes.

Signature of Applicant _____    _4/7/03_
                                                         Date

69

TWC 0063

# Exhibit C

**FICA TAX (Social Security)** - Each employee pays tax on his or her salary for Social Security purposes through payroll deductions. The amount deducted is matched equally by a contribution from Wackenhut, thereby sharing with you the cost of paying for Social Security benefits. These benefits are in the form of retirement pension, Medicare insurance, death benefits to dependents and disability benefits. In addition, in the event of your death, either before or after retirement, your dependents may receive benefits in accordance with the terms of the Social Security Act.

In order to receive proper credit for FICA (Social Security) deductions, you must have a Social Security account card. Report changes in name immediately to your local Social Security office or to the Wackenhut office to which you are assigned so that your earnings will not be reported under two different names.

**WORKERS' COMPENSATION** - According to the laws of the state in which we operate, our Company carries Workers' Compensation Insurance, which applies to all accidental injuries to an employee while at work. The cost is paid entirely by Wackenhut. Workers' Compensation is carried to cover expenses and earnings lost due to injury while you are on the job. The individual laws of your state regulate the amount you are entitled to receive to cover medical expenses and to make up part of any loss in earnings. You must immediately report any work-related injury to your Supervisor.

**UNEMPLOYMENT COMPENSATION** - In accordance with the provisions of your State Unemployment Act, if you become unemployed, due to lack of work, you will be eligible for weekly benefits, provided you meet the requirements of the Act. Wackenhut pays the entire tax in the majority of states.

14

**EQUAL OPPORTUNITY EMPLOYER** - It is the policy of the Wackenhut Corporation is an Equal Opportunity / Affirmative Action Employer. All personnel actions are effected without regard to race, color, religion, sex, national origin, age, ancestry, marital or veteran status, or the presence of a non-job related medical condition or handicap.

**DUTIES** - You have been selected and placed in your present assignment after having met certain requirements necessary to perform your duties. Your Supervisor will instruct you as to what your work and responsibilities are. You should diligently follow your duties and look to your Supervisor for guidance. He or she will answer any questions concerning your job.

**TRANSFERS** - Due to the nature of the contract security industry, no employee shall have a vested interest in any specific assignment, shift, post, or location and may be removed / transferred for any reason including but not limited to a client-directed request. To effect continuity of employment, it may be necessary for you to transfer from your particular location to another site where the Company is in need of employees. If you wish to be considered for a transfer within your present work unit, discuss the matter with your Supervisor.

**TRAINING** - According to your position with the Company, various training programs will be provided. After basic training, your Supervisor will conduct on-the-job training program in which procedures and forms applicable to your job will be discussed. It is the policy of Wackenhut to encourage and assist you in broadening your knowledge and to prepare you for increasing responsibility within the Company. To meet this obligation, manuals, monthly training bulletins and other materials for your self-improvement are available. You are urged to learn as much as you can about your present job and to qualify yourself for other important positions with the Company.

15

## 2. RULES AND REGULATIONS

**2.1 ATTENTION TO DUTY:**
Security Officers shall demonstrate interest in their work by alertness and attention to duty.

**2.2 OBEY LAWS:**
No Security Officer shall knowingly and intentionally violate the laws of the United States, a state, county or municipality.

**2.3 APPEARANCE OF SECURITY OFFICERS:**
Security Officers shall be neat and clean in appearance on duty, and shall wear only the complete uniform as prescribed by their Supervisor.

Leather and brass will be polished.

Due to the public nature of our business, and the business necessity that uniformed personnel represent a figure of authority, a code relative to hair length and facial hair is hereby prescribed:

Hair is to be neatly combed and appropriately cut to accommodate the wearing of the Security Officer cap. The cap is part of the official uniform and is required to be worn by male personnel. Female Security Officers will not wear a uniform cap except when client-requested, and then they are limited to the official cap or a hard hat. Men's hair length should not extend beyond the shirt collar. Female Officers should wear their hair in a neat fashion.

Regarding male facial hair, a neatly trimmed mustache which does not extend beyond the width of the mouth and the lower lip is permitted; neatly trimmed side-burns that do not extend beyond the lower part of the ear lobe are also permitted.

Uniforms will be clean and presentable at all times.

30

Badges will be worn at all times while on duty. If badges are provided, the badge and uniform maybe kept on the client's premises.

It is the responsibility of the Security Officer to maintain the post to which he/she is assigned in a clean and orderly manner.

No insignias, emblems, buttons, or items other than those issued by the Company will be worn on the uniform without the expressed permission of the Company.

Shoes will be black leather or comparable material, and polishable. The shoe style must not inhibit safe, agile, and free movement as determined by the Supervisor.

**2.4 COURTESY TO THE PUBLIC:**
Security Officers will at all times be courteous, kind, patient, and respectful in their dealings with the public and will, by an impartial discharge of their duties, bring credit to themselves, TWC, and the client they represent.

**2.5 PUNCTUALITY:**
Security Officers will be prompt and punctual in all assignments. If a Security Officer, for any reason, is unable to report for duty at the specified time, he/she will notify his/her Supervisor at least 4 hours before shift change. A Security Officer will not leave an assigned post unless properly relieved. Absence without notification will be cause for disciplinary action.

**2.6 ORDERS:**
A Security Officer will obey all order promptly and inform his or her relief of all new orders issued. Willful disregard of orders and instructions will be cause for disciplinary action.

31

71